# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 32128

STATE OF IDAHO, )
)
    Plaintiff-Respondent, )
)
v. )
)
LARRY M. SEVERSON, )
)
    Defendant-Appellant. )
)

Boise, December 2008 Term

2009 Opinion No. 75

Filed: May 29, 2009

Stephen W. Kenyon, Clerk

———————————

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Elmore County. Honorable Michael E. Wetherell, District Judge.

Judgment of conviction for first-degree murder and poisoning food and/or medicine is <u>affirmed</u>.

Molly Huskey, State Appellate Public Defender, Boise, for appellant. Diane Walker and Eric Fredericksen argued.

Honorable Lawrence G. Wasden, Idaho Attorney General, Boise, for respondent. Jessica Lorello argued.

———————————

J. JONES, Justice

    Larry Severson appeals his judgment of conviction for the first-degree murder and poisoning of his wife. We affirm.

## I.

    Larry and Mary Severson met in Colorado in 1995.[1] After dating for a little over one year, the couple married and moved to Mountain Home, Idaho. By 2001, Severson and Mary began experiencing marital problems. Then, in August 2001, the couple separated after Mary learned that Severson was having an affair with a younger woman. Upon learning of the affair, Mary left Severson and returned to Colorado to stay with her mother.

---

[1] Throughout the rest of this opinion, Larry will be referred to as "Severson."

1

Initially, Mary and Severson planned on getting an uncontested divorce. Less than four months after the couple separated, however, Mary changed her mind. Instead of going forward with the divorce, Mary decided to return to Idaho and work on her marriage. In the meantime, Severson continued to see his younger girlfriend, Jennifer Watkins. Severson told Watkins that he and Mary were still getting divorced and even asked Watkins to marry him. Watkins initially accepted Severson's proposal but ended up breaking off the relationship before Mary returned to Idaho.

Mary arrived back in Idaho in December 2001. Once she returned, she and Severson went to the local GNC store so she could purchase some Hydroxycut pills. Mary had started taking Hydroxycut while she was in Colorado in order to help her lose weight. During that time, the pills did not cause her to suffer any adverse side effects. Shortly after Mary began taking the pills she purchased with Severson, however, she started experiencing stomach pain and vomiting blood. This prompted Mary to inspect the pills and, upon doing so, she noticed that they were discolored and warm to the touch. Mary immediately quit taking the pills and scheduled an appointment with her doctor. At the doctor's office, Mary was diagnosed with an ulcer and given a prescription for Prevacid. During a follow-up examination, she also received a prescription for the sleep aid Ambien.

On February 14, 2002, Severson called Mary's doctor and requested a refill of Mary's Ambien prescription. The doctor authorized the refill and Severson picked up the prescription later that same night. The next morning, at approximately 3:00 a.m., Severson purportedly discovered Mary lying on the couch not breathing. Upon finding his wife, Severson called his son and daughter-in-law, Mike and Nora, who immediately rushed to Severson's house. Once there, Nora called 911 and Mike began performing CPR on Mary. Before long, the paramedics arrived and transported Mary to the hospital. Efforts to resuscitate Mary continued in the ambulance and at the hospital, but were ultimately unsuccessful. Mary was pronounced dead at the hospital at approximately 4:15 a.m. that same morning. An autopsy revealed that Mary had ingested significant amounts of the sleep aids Ambien and Unisom, however, her cause of death was listed as "undetermined."

Less than one day passed before the police began investigating Severson's role in Mary's death. Searches of Severson's home and workplace revealed several pieces of evidence including a cardboard tray with broken pieces of Hydroxycut capsules, a pharmacy receipt for

Ambien, Ambien pills under a couch cushion where Mary was discovered, a plastic baggie containing Unisom pills that was hidden inside a hat with the word "dad" printed on it, Unisom tablets in Mary's bathroom and car, and an empty Ambien prescription bottle. Additionally, two bottles of Hydroxycut and an envelope containing some contaminated pills were recovered from Severson's attorney, Jay Clark.[2]

Severson was eventually indicted on one count of first-degree murder and one count of poisoning food and/or medicine. Initially, the indictment alleged that Severson killed Mary by overdosing her with sleeping pills. It was later amended to include possible murder by suffocation. Although Severson objected to the amendment, the trial court permitted it after concluding that it did not charge Severson with a new offense and would not otherwise result in prejudice.

After several changes in attorneys, the Elmore County Public Defender's Office was appointed to represent Severson at trial. Ed Frachiseur was designated as lead counsel and Ellison Matthews was later appointed as co-counsel. Mr. Frachiseur was appointed despite Severson's objection that he had a conflict of interest. In a *pro se* motion to reinstate his former counsel, Severson argued that the appointment of Mr. Frachiseur violated his right to be represented by conflict-free counsel. According to Severson, Mr. Frachiseur was operating under a conflict of interest because another public defender, Terry Ratliff, had represented Mary's mother in a civil suit that was directly related to the criminal case.[3] Despite Severson's objections, the trial court concluded that Mr. Ratliff's conflict did not preclude Mr. Frachiseur from representing Severson.

Severson's case proceeded to trial in October 2004. At the conclusion of the seventeen-day trial, the trial court delivered its instructions to the jury. Although Severson requested that the trial court instruct the jury that, in order to find him guilty of murder, it must unanimously agree on the means by which he killed his wife, the court concluded that such an instruction was unnecessary. After two days of deliberation, the jury returned a general verdict finding Severson guilty of both counts alleged in the indictment. The verdict did not specify whether Severson murdered his wife by overdosing her, suffocating her, or both. Severson then filed two motions

---

[2] Severson allegedly gave Clark the pills so he could investigate a potential products liability claim.
[3] More specifically, the civil case involved the distribution of Mary's life insurance proceeds, the outcome of which turned on whether Severson was a "slayer" under Idaho Code section 15-2-803. *See United Investors Life Ins. Co. v. Severson*, 143 Idaho 628, 151 P.3d 824 (2007).

for judgment of acquittal and a motion for a new trial arguing, among other things, that there was insufficient evidence for the jury to find him guilty of murder. The trial court denied Severson's motions and sentenced him to life without the possibility of parole for murdering his wife and to five years for poisoning food and/or medicine. Severson now appeals the judgment of conviction, alleging that the trial court erred in it rulings on the conflict of interest, the amendment to the indictment, the unanimity instruction, and the sufficiency of the evidence. He also argues that various acts of prosecutorial misconduct deprived him of his right to a fair trial.

## II.

On appeal, we are concerned with six issues: (1) whether Severson was denied his right to be represented by conflict-free counsel; (2) whether the district court erred by allowing the State to amend the indictment without first returning it to the grand jury; (3) whether the district court erred in not instructing the jury that it must unanimously agree on the means by which Severson killed his wife in order to find him guilty of murder; (4) whether there was sufficient evidence for the jury to conclude beyond a reasonable doubt that Severson murdered his wife; (5) whether various acts of alleged prosecutorial misconduct deprived Severson of his right to a fair trial; and (6) whether the accumulation of errors that occurred during Severson's trial rendered the trial unfair.

## A.

Severson argues the district court deprived him of his right to be represented by conflict-free counsel by refusing to impute Mr. Ratliff's conflict of interest to the entire Elmore County Public Defender's Office. According to Severson, the district court's decision should be reversed because the court: (1) failed to conduct an adequate inquiry into the potential conflict; and (2) erred in concluding that the Public Defender's Office did not have a conflict of interest. The State argues that the district court adequately considered the potential conflict, provided Severson an opportunity to be heard on the issue, and correctly determined that Severson's lawyer did not have a conflict of interest. Alternatively, the State argues that even if the trial court did not make a proper inquiry into the conflict, Severson's challenge should fail because he has not established that the conflict adversely affected his lawyer's performance or otherwise resulted in prejudice.[4]

---

[4] Severson did not argue that the conflict adversely affected his lawyer's performance because he maintains that ineffective assistance claims are more appropriately raised in habeas corpus proceedings. *See State v. Roberts*, 129

4

**1.**

A trial court may appoint substitute counsel for an indigent defendant upon a showing of good cause. *State v. Nath*, 137 Idaho 712, 714-15, 52 P.3d 857, 859-60 (2002). Whether substitute counsel should be provided is a decision that lies within the sound discretion of the trial court and will be reviewed on appeal for an abuse of discretion. *Id*. at 715, 52 P.3d at 860. The trial court's decision will only be regarded as an abuse of discretion if it violated the defendant's right to counsel. *Id*.

**2.**

Although Severson acknowledges the district court conducted an inquiry into whether his public defender was operating under a conflict of interest, he argues that the inquiry was inadequate. Severson bases his argument on what he regards as the court's failure to thoroughly consider Mr. Ratliff's representation of Mary's mother, his employment at the Public Defender's Office, and the extent he and Mr. Frachiseur collaborated on their cases. Severson argues that such an in-depth inquiry was necessary because Mr. Ratliff's client would benefit if Severson were found guilty of murder.[5] Additionally, Severson claims that Mr. Frachiseur had an interest in Severson being found guilty because he was assisting Mr. Ratliff in the civil case before being appointed as Severson's public defender.[6] Finally, Severson challenges the court's failure to inquire into whether Mr. Ratliff could be effectively screened from the criminal case. Alternatively, Severson contends that even if the court conducted an adequate inquiry, it erred by failing to warn him of the risks associated with being represented by a lawyer operating under a conflict of interest and by not obtaining a knowing and intelligent waiver. The State, on the other hand, maintains that the inquiry was adequate and that the trial court satisfied its duty once it determined that Mr. Ratliff was employed by the Elmore County Public Defender's Office.

---

Idaho 194, 197, 923 P.2d 439, 442 (1996); *State v. Doe*, 136 Idaho 427, 434-35, 34 P.3d 1110, 1117-18 (Ct. App. 2001) (noting that appellate courts disfavor ineffective assistance claims on direct appeal). He argues a defendant need not show that a conflict adversely affected counsel's performance when an objection to the conflict is made at trial.

[5] If Severson were found guilty, he would be classified as a slayer and be precluded from receiving any of Mary's life insurance proceeds. *See* I.C. § 15-2-803. All of the proceeds would then go to Mr. Ratliff's client.

[6] Severson argues that the fact that Mr. Frachiseur met with Mr. Ratliff and the prosecutor before he was appointed as Severson's lawyer demonstrates that he was involved in the civil case because there is no other explanation for the meeting. In making this claim, Severson relies on a letter Mr. Ratliff sent to the trial court, which stated "[t]wo days ago, Mr. Frachiseur and myself talked with Aaron Bazzoli as to the witnesses involved in this case." Other than this statement, there is no evidence to support Severson's contention that Mr. Frachiseur was involved in the civil case.

According to the State, the court's "only remaining obligation was to determine whether Mr. Ratliff's [undisputed] conflict was imputed to Mr. Frachiseur."

The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of Counsel for his defence."[7]  U.S. CONST. amend. VI.  The amendment has been interpreted to include the right to be represented by conflict-free counsel.  *Wood v. Georgia*, 450 U.S. 261, 271 (1981).  In order to ensure that a defendant receives conflict-free counsel, a trial court has an affirmative duty to inquire into a potential conflict whenever it knows or "reasonably should know that a particular conflict may exist."  *State v. Lovelace*, 140 Idaho 53, 60, 90 P.3d 278, 285 (2003); *see also Cuyler v. Sullivan*, 446 U.S. 335, 347 (1980).  A trial court's failure to conduct an inquiry, under certain circumstances, will serve as a basis for reversing a defendant's conviction.  *Holloway v. Arkansas*, 435 U.S. 475, 488 (1978); *Cuyler*, 446 U.S. at 346-47.

Whether a trial court's failure to adequately inquire into a potential conflict of interest is enough, on its own, to justify reversal depends on whether the defendant objected to the conflict at trial.  *See Cuyler*, 446 U.S. at 348; *see also Selsor v. Kaiser*, 22 F.3d 1029, 1032 (10th Cir. 1994); *Hamilton v. Ford*, 969 F.2d 1006, 1011 (11th Cir. 1992).  When a trial court fails to make a proper inquiry, but the defendant did not object to the conflict at trial, the defendant's conviction will only be reversed if he or she can prove that an actual conflict of interest adversely affected his lawyer's performance.  *Cuyler*, 446 U.S. at 348; *see also United States v. Sutton*, 794 F.2d 1415, 1419 (9th Cir. 1986).  The defendant need not, however, show prejudice in order to obtain relief.  *Cuyler*, 446 U.S. at 349-50.  On the other hand, once a defendant raises a timely objection to a conflict, the trial court is constitutionally obligated to determine whether an actual conflict of interest exists.[8]  *Hamilton*, 969 F.2d at 1011; *see also Sutton*, 794 F.2d at 1419.  A court's failure to make a proper inquiry after a defendant's timely objection will result

---

[7] The Amendment has been incorporated through the Due Process Clause of the Fourteenth Amendment to apply to the states.  *See Powell v. Alabama*, 287 U.S. 45, 73 (1932).  Idaho law also guarantees a criminal defendant's right to counsel.  *See* IDAHO CONST. art. I, § 13; I.C. § 19-852.

[8] Although the United States Supreme Court cases addressing a court's duty to inquire were decided in the context of joint representation of co-defendants, the principles outlined in those cases are not limited to joint representation conflicts.  *See, e.g., Mickens v. Taylor*, 535 U.S. 162, 175 (2002) (noting that the duty to inquire applies when "counsel *actively represent[s]* conflicting interests"); *United States v. Winkle*, 722 F.2d 605, 610 (10th Cir. 1983) (concluding that *Holloway* applied to a conflict arising from defense counsel's prior representation of a government witness in litigation that was factually connected to the criminal case); *State v. Cook*, 144 Idaho 784, 791-92, 171 P.3d 1282, 1289-90 (Ct. App. 2007) (similar).

in the automatic reversal of the defendant's conviction. *See Holloway*, 435 U.S. at 488-89; *Hamilton*, 969 F.2d at 1012; *United States v. Rodriguez*, 278 F.3d 486, 492 (5th Cir. 2002). Because the trial court's duty to inquire after a defendant makes a timely objection is a separate and distinct obligation, a defendant in such circumstances need not show that an actual conflict adversely affected the lawyer's performance.[9] *See Holloway*, 435 U.S. at 488-90; *Hamilton*, 969 F.2d at 1011-12.

Here, because Severson objected to the conflict of interest at trial, the court had an affirmative duty to inquire into the potential conflict. If the trial court failed to conduct an adequate inquiry, Severson's conviction must be reversed regardless of whether the conflict adversely affected his lawyer's performance. The adequacy of a trial court's inquiry is a constitutional issue over which we exercise free review. *See State v. Lopez*, 139 Idaho 256, 259, 77 P.3d 124, 127 (Ct. App. 2003).

In order to satisfy the inquiry requirement, a trial court's examination of the potential conflict must be thorough and searching and should be conducted on the record. *See id*.; *Smith v. Lockhart*, 923 F.2d 1314, 1320 (8th Cir. 1991). The court "must make the kind of inquiry that might ease the defendant's dissatisfaction, distrust, or concern." *Smith*, 923 F.2d at 1320. However, in determining whether a conflict exists, trial courts are entitled to rely on representations made by counsel. *Kaplan v. United States*, 375 F.2d 895, 897 (9th Cir. 1967). A

---

[9] The State argues that under *Cuyler* a trial court's failure to conduct a proper inquiry only requires reversal when the conflict adversely affected the lawyer's performance. Read broadly, language from this Court's opinion in *State v. Lovelace*, 140 Idaho 53, 90 P.3d 278 (2003), appears to support the State's argument. In *Lovelace*, we stated that "[*Holloway's* automatic reversal rule] is limited to cases where a trial court improperly requires joint representation over timely objection. . . . Furthermore, *Holloway* has been overruled as to a *per se* reversal in favor of requiring a showing as in *Cuyler* that the potential conflict of interest adversely affected counsel's performance." *Id*. at 61, 90 P.3d at 286. *Lovelace*, however, dealt with a defendant's claim that his lawyer's conflict resulted in ineffective assistance of counsel – it did not involve a direct challenge to the trial court's failure to inquire into the conflict. *Id*. Moreover, in *Mickens v. Taylor*, 535 U.S. 162 (2002), the case we relied on in *Lovelace*, the United States Supreme Court acknowledged that *Holloway* still applies when a trial court fails to conduct an inquiry after a defendant's timely objection. *See Mickens*, 535 U.S. at 168 ("*Holloway* thus creates an automatic reversal rule only where defense counsel is forced to represent codefendants over his timely objection, unless the trial court has determined that there is no conflict."). In *Mickens*, the Court simply refused to extend *Holloway* to cases where the trial court had an independent duty to inquire but failed to do so. *Id*. at 172-73. Accordingly, *Cuyler's* adverse affect requirement is limited to cases where a defendant failed to object to the conflict at trial. *See Cuyler*, 446 U.S. at 348 ("In order to establish a violation of the Sixth Amendment, a defendant *who raised no objection at trial* must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." (emphasis added)). Because Severson objected to the conflict at trial and is now challenging the court's alleged failure to conduct an adequate inquiry, *Cuyler* is inapplicable.

court may inquire further into the facts, but "is under no original or continuing obligation to do so." *Id.*

Once a court conducts an inquiry, it must determine whether a conflict actually exists. *Lopez*, 139 Idaho at 259, 77 P.3d at 127. If the court concludes defense counsel does have a conflict, it must obtain a knowing and voluntary waiver from the defendant or give the defendant an opportunity to acquire new counsel. *Id.* If, on the other hand, the court concludes that a conflict of interest does not exist, the representation may continue without a waiver. *See id.*

The record in this case demonstrates that the trial court conducted a proper inquiry into the potential conflict of interest. After learning of the possible conflict, the court acknowledged that Mr. Ratliff's employment with the Elmore County Public Defender's Office might have created a conflict for Mr. Frachiseur. The court then scheduled a hearing so it could "conduct a searching inquiry as to the potential conflict." At the hearing, the court allowed both sides to present testimony. Although the court gave Severson the opportunity to voice his concerns about the representation, he declined to do so. Mr. Frachiseur, however, informed the court that Mr. Ratliff was no longer representing Mary's mother in the civil case. Based on this information, the court concluded that Mr. Ratliff's conflict would not justify removing Mr. Frachiseur as defense counsel. It reasoned that because most of the issues in the civil case had been settled, "Mr. Ratliff would no longer have any financial interest in any further proceedings in that case."[10] The court then advised the parties that it would set forth the rest of its reasoning in a written opinion to be issued within a few days.

In its written opinion, the court acknowledged that Mr. Ratliff's prior representation of Mary's mother created a conflict of interest that would preclude him from representing Severson. However, the court concluded that the conflict did not require the disqualification of Mr.

---

[10] Severson argues that this finding is contrary to this Court's opinion in *United Investors Life Insurance Co. v. Severson*, 143 Idaho 628, 151 P.3d 824 (2007), in which we stated that the trial court's order granting Mary's mother's motion for partial summary judgment "did not make any final decision as to Severson's interest in or rights to the proceeds." *Id.* at 631, 151 P.3d at 827. According to Severson, this Court's statement casts doubt on the trial court's conclusion that Mr. Ratliff no longer had a financial interest in the litigation. Severson's argument is unpersuasive, however, because the quoted statement was discussing the trial court's order granting Mary's mother's motion for summary judgment regarding the $100,000.00 she was entitled to as a beneficiary. Severson did not appeal this order. The decision in *United Investors* dealt with whether Severson was entitled to the remaining $100,000.00 because the policy premiums were paid for with community property. Because we held that Severson was precluded from receiving any of the insurance proceeds under the slayer statute and that Mary's estate should receive the remaining $100,000.00, the trial court did not incorrectly conclude that Mr. Ratliff no longer had a financial interest in the case.

Frachiseur. The court reasoned that because the Elmore County Public Defender's Office was not a "firm," Mr. Ratliff's conflict should not be imputed to Mr. Frachiseur under Rule 1.10 of the Idaho Rules of Professional Conduct. Additionally, there was no evidence that Mr. Frachiseur and Mr. Ratliff communicated about Severson's case or that they shared information adverse to Severson's interests. Still, as a precaution, the court directed the Public Defender's Office to "completely screen Mr. Ratliff from involvement in any activities or information relating to [Severson's case]."

The district court's inquiry into Mr. Ratliff's conflict satisfied its constitutional obligation. The court held a hearing on the record and gave both sides the opportunity to address the potential conflict. Although the court did not ask the specific questions Severson now claims were necessary, Severson was given the opportunity to draw the trial court's attention to his specific concerns, but failed to do so. Additionally, after conducting the inquiry, the court concluded that Mr. Ratliff had a conflict of interest. If the court's inquiry had been inadequate, it would have been unable to reach this conclusion. Because the district court conducted an adequate inquiry into the conflict, Severson is not entitled to automatic reversal of his conviction. The issue remains, however, as to whether the court's decision not to impute the conflict to Mr. Frachiseur was in accordance with Idaho law.

**3.**

Severson argues that, even if the district court conducted a proper inquiry, it erred by not imputing Mr. Ratliff's conflict of interest to the Public Defender's Office. He contends that the conflict should have been imputed because Mr. Frachiseur had "close personal and financial relations" with Mr. Ratliff. Additionally, Severson challenges the district court's reliance on a screening mechanism. He maintains that requiring the Public Defender's Office to screen Mr. Ratliff was an abuse of discretion because the Rules of Professional Conduct did not provide for screening at that time. Alternatively, even if screening was proper, Severson maintains that it would only be an appropriate remedy if he consented to the conflict, which he did not.

To determine whether an actual conflict of interest exists, Idaho Courts look to the standards set forth in the Idaho Rules of Professional Conduct. *See, e.g., State v. Wood*, 132 Idaho 88, 98, 967 P.2d 702, 712 (1998). Rule 1.7 addresses conflicts of interests and, in 2004, provided that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest." Idaho R. Prof. Conduct 1.7. A concurrent conflict of interest exists when

9

"the representation of one client will be directly adverse to another client" or when "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by the personal interests of the lawyer." *Id*. Representation may continue despite a concurrent conflict of interest when, among other things, a client waives the conflict through informed consent. *Id*.

Under Rule 1.10, a lawyer's concurrent conflicts of interest are imputed to his or her entire firm. Idaho R. Prof. Conduct 1.10. The rule, as it existed in 2004, provided:

> While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule[] 1.7 . . . unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.

*Id*. The Rules define the term "firm" as "lawyers in a law partnership, professional corporation, sole proprietorship or other association authorized to practice law; or lawyers employed in a legal services organization or the legal department of a corporation or other organization." *Id*. cmt. 1; *see also* Idaho R. Prof. Conduct 1.0(c). The comments to the Rules go on to state:

> With respect to the law department of an organization, including the government, there is ordinarily no question that the members of the department constitute a firm within the meaning of the Rules of Professional Conduct. There can be uncertainty, however, as to the identity of the client. For example, it may not be clear whether the law department of a corporation represents a subsidiary or an affiliated corporation, as well as the corporation by which the members of the department are directly employed.

Idaho R. Prof. Conduct 1.0 cmt. 3. Ultimately, however, whether an entity should be regarded as a "firm" must be evaluated in light of the underlying purpose of Rule 1.10, namely, ensuring client loyalty and confidentiality. *Id*. cmt. 2; Idaho R. Prof. Conduct 1.10 cmt. 2.

In this case there is no dispute that Mr. Ratliff's representation of both Mary's mother and Severson would give rise to a concurrent conflict of interest. The issue is whether Mr. Ratliff's conflict should have been imputed to the entire Elmore County Public Defender's Office. The answer to this question depends on whether a public defender's office constitutes a "firm" under the meaning of Rule 1.10.

The classification of public defenders' offices under the Rules of Professional Conduct is a matter of first impression for this Court. However, the Idaho Court of Appeals addressed the issue in an opinion rendered after the trial court's decision in this case. *See State v. Cook*, 144

Idaho 784, 171 P.3d 1282 (Ct. App. 2007). In *Cook*, the court drew a distinction between private law firms and public defenders' offices and declined to impute one public defender's conflict to the entire office. *Id*. at 794, 171 P.3d at 1292. In its decision, the court refused to adopt a *per se* rule regarding the treatment of public defenders' offices under the Rules. *Id*. Instead, it decided that it was preferable to analyze whether one public defender's conflict should be imputed to the entire office on a case-by-case basis. *Id*. Under this approach, the relevant inquiry is "whether 'the circumstances demonstrate a potential conflict of interest *and* a significant likelihood of prejudice.'" *Id*. at 793, 171 P.3d at 1291 (quoting *State v. Bell*, 447 A.2d 525, 529 (N.J. 1982)). If so, there is a presumption that "'both an actual conflict of interest and actual prejudice will arise.'" *Id*. In reaching its decision, the court reasoned that:

> automatically disqualifying a public defender where another attorney in the office has a conflict of interest would significantly hamper the ability to provide legal representation of indigent clients. This, together with the fact that such concurrent representation by public defenders generally will create no incentive (economic or otherwise) for diminished advocacy in such cases, convinces us that a *per se* rule imputing conflicts of interest to affiliated public defenders is inappropriate where there is no indication the conflict would hamper an attorney's ability to effectively represent a client.

*Id*. at 794, 171 P.3d at 1292.

*Cook* is in accord with this Court's recognition that *per se* rules requiring automatic disqualification are "unnecessary and patently unworkable." *City of Coeur d'Alene v. Simpson*, 142 Idaho 839, 844, 136 P.3d 310, 315 (2006). Analyzing conflicts within a public defender's office on a case-by-case basis permits flexibility and ensures that indigent defendants receive adequate representation. At the same time, it protects defendants who would otherwise be prejudiced by a public defender's conflict of interest. The *Cook* framework also takes into account the unique nature of public defenders' offices. Unlike other government attorneys, public defenders represent individual clients rather than the government itself. Unlike lawyers in a firm, public defenders do not have a financial incentive to represent clients with conflicts of interest because they do not share legal fees. For these reasons, we hold that the framework set

11

forth by the Court of Appeals in *Cook* is the appropriate standard for analyzing conflicts within public defenders' offices.[11]

In this case, the first prong of *Cook* has clearly been established. Mr. Ratliff's representation of Mary's mother created a conflict of interest. Accordingly, whether the conflict should be imputed depends on whether the representation presented a significant likelihood of prejudice.

There is no evidence in the record that would support the conclusion that Mr. Ratliff's conflict was likely to result in prejudice. Nor is there any indication in the record that Mr. Ratliff and Mr. Frachiseur were acting in a manner adverse to Severson's interests. In fact, Mr. Ratliff actually took steps to ensure that Severson received diligent representation.[12] Additionally, Mr. Frachiseur was not the only attorney representing Severson – Mr. Matthews served as co-counsel throughout the entire trial. The presence of co-counsel further diminished any likelihood of prejudice since there has been no indication that Mr. Matthews was operating under a conflict of interest. Finally, the court's order requiring the public defender's office to screen Mr. Ratliff from Severson's case minimized the likelihood that Severson would be prejudiced by Mr. Frachiseur serving as his lawyer.[13] *See Cook*, 144 Idaho at 794 n.8, 171 P.3d at 1292 n.8 (noting that the likelihood of prejudice is influenced by "whether an office has set up effective measures to prevent communication of confidential client information between lawyers employed on behalf of individual defendants"). Because Mr. Frachiseur's representation of Severson did not

___

[11] Severson argues that conflict rules should not be relaxed in the public defender context because indigent defendants have the same right to be represented by conflict-free counsel as those who retain their own lawyers. He points out that public defenders get paid by the hour for capital cases and, therefore, have a financial incentive to represent clients with conflicts of interest. Severson's argument is unconvincing since it disregards the other public policy reasons that favor distinguishing public defenders' offices from private law firms. Severson also argues that *Cook* should be modified to require disqualification based on the statutory right to counsel contained in Idaho Code section 19-852. That statute provides that "[a] needy person who is . . . under formal charge of having committed . . . a serious crime, is entitled . . . to be represented by an attorney to the same extent as a person having his own counsel is so entitled." I.C. § 19-852. Severson, however, fails to indicate why the statutory right to counsel demands a different result than the constitutional right to counsel.

[12] Before Mr. Frachiseur was appointed to represent Severson, Mr. Ratliff wrote a letter to the court expressing his concern that Severson's previous lawyers were not providing adequate representation.

[13] Severson's argument that screening was improper because it was not provided for under the Rules of Professional Conduct is unpersuasive. Just because the Rules did not provide for screening at the time does not mean that screening was not an available tool. Similarly, Severson's related argument that screening was only proper if he consented to the conflict is also unavailing. The trial court was not required to obtain Severson's consent because Mr. Ratliff's conflict was not imputed to the entire public defender's office. Nor was the court required to inquire into the feasibility of screening before entering its order. The inquiry requirement is limited to determining whether a potential conflict exists. In any event, once the trial court ordered that Mr. Ratliff be screened the Public Defender's Office was required to implement effective screening measures.

present a significant likelihood of prejudice, the trial court properly concluded that Mr. Ratliff's conflict of interest should not be imputed to the entire Public Defender's Office. Accordingly, the court was not required to obtain Severson's consent for the representation to continue and Severson was not deprived of his right to be represented by conflict-free counsel.

**B.**

Severson argues that the trial court's decision allowing the State to amend the indictment to include possible murder by suffocation without first returning it to the grand jury deprived the court of jurisdiction. He maintains that because the prosecutor chose to proceed by indictment, he was entitled to have the grand jury decide what actions gave rise to the charge. Additionally, Severson argues that the amendment was improper because the grand jury considered whether he murdered his wife by suffocation, but declined to indict him on that basis. The State counters that the grand jury's decision not to indict Severson for murder by suffocation did not preclude the court from granting the State's motion to amend the indictment. Further, it maintains that Severson's focus on the amendment's affect on the court's jurisdiction is misleading. According to the State, the issue is one of due process. It contends the amendment to the indictment did not violate due process because it only modified the possible means by which the offense was committed and, therefore, did not prejudice Severson.

**1.**

Whether an amendment to an indictment should be permitted is a matter within the sound discretion of the trial court. Idaho Crim. R. 7(e); *see also State v. LaMere,* 103 Idaho 839, 841-42, 655 P.2d 46, 48-49 (1982). The trial court's decision to allow or disallow an amendment will be reviewed for an abuse of discretion. *Id.* Permitting an amendment will only be regarded as an abuse of discretion when the amendment prejudices the substantial rights of the defendant. *Id.* at 842, 655 P.2d at 49. Conversely, whether a charging document conforms to the requirements of the law and whether a court has jurisdiction are questions of law, over which this Court exercises free review. *State v. Jones*, 140 Idaho 755, 757, 101 P.3d 699, 701 (2004).

**2.**

Article I, section 8 of the Idaho Constitution guarantees that "[n]o person shall be held to answer for any felony or criminal offense . . . unless on presentment or indictment of a grand jury or on information of the public prosecutor." Under this provision, a prosecutor may choose to bring charges against a defendant by indictment or information. *State v. Nelson*, 131 Idaho

13

210, 214, 953 P.2d 650, 654 (Ct. App. 1998). Because the charging document is the instrument that confers subject matter jurisdiction on a court, whether a court has subject matter jurisdiction depends on whether the charging document is legally sufficient. *State v. Rogers*, 140 Idaho 223, 228, 91 P.3d 1127, 1132 (2004); *State v. Quintero*, 141 Idaho 619, 621, 115 P.3d 710, 712 (2005).

To be legally sufficient, a charging document must meet two requirements: it must impart jurisdiction and satisfy due process. *Quintero*, 141 Idaho at 621, 115 P.3d at 712. An indictment confers jurisdiction when it alleges that the defendant committed a criminal offense in the State of Idaho. *Id.*; *Jones*, 140 Idaho at 757-58, 101 P.3d at 701-02. Objections regarding an indictment's conferral of jurisdiction may be made for the first time on appeal. *Jones*, 140 Idaho at 758, 101 P.3d at 702. An indictment satisfies due process when, among other things, it contains "factual specificity adequate to 'enable a person of common understanding to know what is intended' and to shield against double jeopardy." *Id.* (quoting *State v. Grady*, 89 Idaho 204, 209, 404 P.2d 347, 349-50 (1965)). Unlike jurisdictional challenges, objections to an indictment on grounds of due process are waived if not raised before trial. *Id.*

The indictments in this case were sufficient to vest the trial court with subject matter jurisdiction. Both the original and the amended indictment alleged that Severson had committed a criminal offense in the State of Idaho. Specifically, they accused Severson of committing first-degree murder in Elmore County. Because the indictments adequately alleged that Severson committed the crime of murder in the State of Idaho, they were sufficient to vest the court with jurisdiction to conduct a trial on that charge. The remaining issue then, is whether the amended indictment complied with due process.[14]

Due process requires that an indictment be specific enough to ensure that the defendant has a meaningful opportunity to prepare his defense and to protect the defendant from a subsequent prosecution for the same act. *State v. Gumm*, 99 Idaho 549, 551, 585 P.2d 959, 961 (1978); *see also State v. Banks*, 113 Idaho 54, 58, 740 P.2d 1039, 1043 (Ct. App. 1987).

---

[14] Severson has not waived his due process challenge. In his memorandum in opposition to the prosecutor's motion to amend the indictment, Severson relied, in part, on due process considerations to oppose the amendment. In the motion he stated that "[t]he Idaho Constitution . . . guarantees a defendant due process . . . and guarantees a defendant the right to be advised of the charges against him." While Severson primarily characterizes the issue on appeal as one of jurisdiction, he also argues that it "rise[s] to the level of a constitutional violation." Accordingly, we will consider whether the amended indictment violated Severson's right to due process.

Accordingly, an indictment must do more than simply state the offense charged. *State v. McMahan*, 57 Idaho 240, 250, 65 P.2d 156, 159-60 (1937). It must also clearly indicate the facts giving rise to the offense or the means by which the defendant committed the alleged crime.[15] *See id.*; *Banks*, 113 Idaho at 57, 740 P.2d at 1042.

An indictment may be amended at any time before the prosecution rests without being returned to the grand jury, so long as doing so does not prejudice the defendant's substantial rights or charge the defendant with a new offense. Idaho Crim. R. 7(e); *see also* I.C. § 19-1420; *State v. O'Neill*, 118 Idaho 244, 249, 796 P.2d 121, 126 (1990). Thus, an amendment that merely alleges additional means by which the defendant may have committed the crime is permissible if it does not prejudice the defendant. *See Banks*, 113 Idaho at 57-60, 740 P.2d at 1042-45 (permitting amendment to information to include age of victim in order to reflect statutory rape as an alternative way of committing rape); *see also People v. Liberty*, 178 P. 868, 868 (Cal. 1919) (holding that the trial court's decision to permit an amendment adding additional means by which the defendant committed the crime of engaging in lewd and lascivious acts with a minor was permissible because it did not prejudice the defendant's rights); *People v. Coleman*, 276 N.E.2d 721, 724 (Ill. 1971) (holding that an amendment to an indictment alleging alternative means by which defendant may have killed his wife was permissible because it did not prejudice the defendant); *People v. McKendrick,* 486 N.E.2d 1297, 1303-04 (Ill. App. Ct. 1985) (holding that an amendment modifying the means by which the defendant committed sexual assault was permissible); *State v. Powell*, 664 P.2d 1, 3 (Wash. Ct. App. 1983) (holding that it was within the trial court's discretion to amend the indictment to include alternative means of committing first-degree murder). Factors relevant to determining whether the defendant was prejudiced include whether the amendment alleging the additional facts took the defendant by surprise, impaired the defendant's ability to adequately prepare his defense, necessitated extensive further preparation

---

[15] This requirement is also imposed by statute. *See* I.C. § 19-1409(2) (stating that the indictment must contain "[a] statement of the acts constituting the offense in ordinary and concise language"); I.C. § 19-1418(6) & (7) (stating that an indictment is sufficient if "the act or omission charged as the offense is clearly and distinctly set forth" and "is stated with such a degree of certainty as to enable the court to pronounce judgment upon conviction"); I.C. § 19-1411(3) (stating that an indictment must be "direct and certain" in regards to the "particular circumstances of the offense charged, when they are necessary to constitute a complete offense"); *see also* Idaho Crim. R. 7(b) (stating that an indictment must include "a plain, concise, and definite written statement of the essential facts constituting the offense charged").

by the defendant, or subjected him to double jeopardy. *Banks*, 113 Idaho at 58-60, 740 P.2d at 1043-45; *Coleman*, 276 N.E.2d at 724.

The amendment to the indictment in this case was permissible under standards of due process and Rule 7(e).[16] First, the amendment did not charge Severson with a new offense. Both indictments charged Severson with the first-degree murder of his wife. The amendment merely alleged an alternative way Severson might have committed the crime.[17] Second, the amendment did not prejudice any of Severson's substantial rights. It was made nearly one whole year before trial and, therefore, gave Severson more than adequate time to prepare his defense relating to the allegation of murder by suffocation. It did not take Severson by surprise because he was aware that the prosecution had advanced the theory that Mary died from suffocation.[18] Nor did it subject Severson to double jeopardy. If the jury had convicted or acquitted Severson under the original indictment, he could not later be tried on the amended indictment. Further, Severson has not presented any facts or arguments to support the conclusion that the amendment resulted in prejudice. Because the amended indictment did not charge Severson with a new offense or result in prejudice, the amendment was permissible under principles of due process and Rule 7(e).

## C.

Severson argues that the district court committed reversible error by rejecting his request to instruct the jury that it must unanimously agree upon the specific means by which he killed his wife in order to find him guilty of murder. Severson maintains that the district court's failure to give a specific unanimity instruction violated his right to a unanimous jury verdict because the jury could have found him guilty of first-degree murder for killing his wife by overdosing her with sleeping pills, suffocating her, or both. The State, on the other hand, maintains that the

---

[16] Because the indictment was amended to include *additional* acts that may have given rise to the offense, it is distinguishable from the indictments in the cases Severson cites, which *never* indicated the means by which the defendant committed the crime. *See, e.g., McMahan*, 57 Idaho at 249-50, 65 P.2d at 159-60.

[17] Severson argues that under *O'Neill* an amendment is only permissible if the acts comprising the crime in the amended indictment are the same as those in the original indictment. He relies on statements in *O'Neill* that "the facts alleged rather than the designation of the offense, control" and that the defendant was not "charged with a totally different crime, nor any acts different than those originally alleged." *O'Neill*, 118 Idaho at 249-50, 796 P.2d at 126-27. However, Severson's characterization of *O'Neill* is misleading because that case dealt with an amendment that alleged a violation of a different statutory provision. Here, both indictments charged Severson with murder under Idaho Code sections 18-4001, 4002, & 4003.

[18] Severson had a copy of the grand jury transcript of Dr. Groben's testimony, which indicated that Mary may have died by suffocation. Additionally, Severson acknowledged that suffocation was a possible manner of death in his motion to dismiss or quash the grand jury indictment, which was filed in May 2003 – five months before the State sought permission to amend the indictment.

unanimity requirement does not apply to the jury's determination of the victim's cause of death. Alternatively, it argues that even if Severson was entitled to a unanimity instruction, the trial court's failure to give the instruction was harmless error.

**1.**

This Court exercises free review over whether a jury was given proper instructions. *Miller v. State*, 135 Idaho 261, 265, 16 P.3d 937, 941 (Ct. App. 2000). An error in jury instructions only constitutes reversible error when the instruction misled the jury or prejudiced the party challenging the instruction. *State v. Row*, 131 Idaho 303, 310, 955 P.2d 1082, 1089 (1998). If the instructions, "considered as a whole, fairly and adequately present the issues and state the applicable law, then no error [has been] committed." *Suitts v. First Sec. Bank of Idaho, N.A.,* 110 Idaho 15, 19, 713 P.2d 1374, 1378 (1985); *see also Row*, 131 Idaho at 310, 955 P.2d at 1089.

**2.**

A trial court presiding over a criminal case must instruct the jury on all matters of law necessary for the jury's information. I.C. § 19-2132. In other words, a trial court must deliver instructions on the rules of law that are "material to the determination of the defendant's guilt or innocence." *State v. Mack,* 132 Idaho 480, 483, 974 P.2d 1109, 1112 (Ct. App. 1999). This necessarily includes instructions on the "nature and elements of the crime charged and the essential legal principles applicable to the evidence that has been admitted." *State v. Gain*, 140 Idaho 170, 172, 90 P.3d 920, 922 (Ct. App. 2004). Each party is entitled to request the delivery of specific instructions. However, such instructions will only be given if they are "correct and pertinent." I.C. § 19-2132. A proposed instruction is not "correct and pertinent" if it is: (1) an erroneous statement of the law; (2) adequately covered by other instructions; or (3) "not supported by the facts of the case." *State v. Olsen,* 103 Idaho 278, 285, 647 P.2d 734, 741 (1982).

Under Idaho law, a trial court is required to instruct the jury that it must unanimously agree on the defendant's guilt in order to convict the defendant of a crime. *Miller*, 135 Idaho at 267-68, 16 P.3d at 943-44; *see also* IDAHO CONST. art. I, § 7; I.C. §§ 19-2316 & 2317; Idaho Crim. R. 31. An instruction that the jury must unanimously agree on the facts giving rise to the

offense, however, is generally not required.[19] *State v. Nunez*, 133 Idaho 13, 19, 981 P.2d 738, 744 (1999); *see also Schad v. Arizona*, 501 U.S. 624, 631 (1991) ("We have never suggested that in returning general verdicts . . . jurors should be required to agree upon a single means of commission."). In *Nunez*, a police officer was indicted for several crimes relating to drugs and money stolen from the police station's evidence lockers. *Nunez*, 133 Idaho at 15, 981 P.2d at 740. The officer was found guilty of racketeering, misuse of public monies, sales tax violations, and conspiracy to alter or destroy evidence. *Id.* at 16, 981 P.2d at 741. On appeal, the officer challenged the district court's decision not to instruct the jury that it must unanimously agree on the underlying act giving rise to the misuse of public monies charge. *Id.* at 18-19, 981 P.2d at 743-44. We rejected the officer's argument and held that there is generally no "requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict." *Id.* at 19, 981 P.2d at 744. We reasoned that the jury must only reach a unanimous decision regarding the defendant's guilt – "not the underlying facts that establish the elements of the crime." *Id.*; *see also Downing v. State*, 136 Idaho 367, 372-73, 33 P.3d 841, 846-47 (Ct. App. 2001) (concluding that a defendant charged with lewd conduct involving manual-genital and/or genital-genital contact was not entitled to a specific unanimity instruction because "[t]he prohibited acts [we]re merely alternative means by which [the] defendant . . . may be held criminally liable"). To require unanimous factual findings would ignore the fact that "different jurors may be persuaded by different pieces of evidence, even [though] they agree upon the bottom line." *Schad*, 501 U.S. at 631-32 (quoting *McKoy v. North Carolina*, 494 U.S. 433, 449 (1990) (Blackmun, J., concurring)). Because the jury was not required to unanimously agree on the facts constituting the crime, a specific unanimity instruction was not required. *Nunez*, 133 Idaho at 19, 981 P.2d at 744.

An instruction informing the jury that it must unanimously agree on the specific occurrence giving rise to the offense is necessary, however, when the defendant commits several acts, each of which would independently support a conviction for the crime charged. *See Miller*,

---

[19] The United States Supreme Court has indicated, however, that due process would not permit states to convict defendants of crimes so generic that any number of findings by the jury could result in a finding of guilt. *See Schad v. Arizona*, 501 U.S. 624, 633 (1991) (stating that "nothing in our history suggests that the Due Process Clause would permit a State to convict anyone under a charge of 'Crime' so generic that any combination of jury findings of embezzlement, reckless driving, murder, burglary, tax evasion, or littering, for example, would suffice for conviction").

135 Idaho at 268, 16 P.3d at 944; *State v. Montoya*, 140 Idaho 160, 167-68, 90 P.3d 910, 917-18 (Ct. App. 2004); *Gain*, 140 Idaho at 172-73, 90 P.3d at 922-23. In *Miller*, the defendant was convicted on one count of engaging in manual-genital contact with an eight-year-old girl. *Miller*, 135 Idaho at 264, 16 P.3d at 940. Even though the evidence presented at trial revealed that the contact had occurred on six separate occasions, the trial court did not give a specific unanimity instruction to the jury. *Id*. at 268, 16 P.3d at 944. On appeal, the Court of Appeals held that a specific unanimity instruction should have been given. *Id.* The court reasoned that such an instruction was proper because each instance in which the contact took place was "a separate incident – a distinct union of *mens rea* and *actus reus* separated by a discrete period of time and circumstance from any other such similar incident." *Id*. Since the prosecutor could have charged the defendant for each of the six instances, the defendant was entitled to have the jury instructed that it must agree on a single incident in order to find him guilty. *Id*.

The trial court in this case was not required to instruct the jury that it must unanimously agree on the means by which Severson killed his wife in order to find him guilty of murder. Such an instruction would not have been "correct and pertinent" under section 19-2132 because it was not supported by the facts of the case. Severson was charged with the single act of murdering his wife. The evidence presented at trial did not allege that he engaged in the conduct giving rise to the offense on more than one occasion. Although the evidence showed that Severson could have murdered his wife by either overdosing her or suffocating her, it did not indicate that separate incidents involving distinct unions of *mens rea* and *actus reus* occurred. The very nature of the crime of murder eliminates this possibility. Absent evidence of more than one instance in which Severson engaged in the charged conduct, the jury was not required to unanimously agree on the facts giving rise to the offense. *See Gain*, 140 Idaho at 174, 90 P.3d at 924 (concluding that a specific unanimity instruction was not required where the State presented evidence of one incident that served as the basis for all three counts the defendant was charged with). The jury could have found Severson guilty of murdering his wife by overdosing her, suffocating her, or both. Because there was no risk that Severson could be convicted of the single act of murdering Mary on more than one occasion, the trial court did not err by not giving a specific unanimity instruction to the jury.

**D.**

Severson argues that there was insufficient evidence for the jury to find him guilty of murdering his wife. He points out that, while the State presented evidence regarding the possible causes of Mary's death, it did not offer any evidence linking her death to a criminal act he committed. The State maintains that it presented enough evidence for the jury to conclude beyond a reasonable doubt that Severson murdered his wife.

**1.**

We will uphold a judgment of conviction entered upon a jury verdict so long as there is substantial evidence upon which a rational trier of fact could conclude that the prosecution proved all essential elements of the crime beyond a reasonable doubt. *State v. Sheahan*, 139 Idaho 267, 285, 77 P.3d 956, 974 (2003). Evidence is substantial if a "reasonable trier of fact would accept it and rely upon it in determining whether a disputed point of fact has been prove[n]." *State v. Mitchell*, 130 Idaho 134, 135, 937 P.2d 960, 961 (Ct. App. 1997). On appeal from a defendant's conviction, we view the evidence in the light most favorable to the prosecution in determining whether substantial evidence exists. *Sheahan*, 139 Idaho at 286, 77 P.3d at 975. We will not substitute our own judgment for that of the jury on matters such as the credibility of witnesses, the weight to be given to certain evidence, and "the reasonable inferences to be drawn from the evidence." *Id*. (quoting *State v. Allen*, 129 Idaho 556, 558, 929 P.2d 118, 120 (1996)). Accordingly, substantial evidence may exist even when the evidence presented is solely circumstantial or when there is conflicting evidence. *State v. Stevens*, 93 Idaho 48, 50-51, 454 P.2d 945, 947-48 (1969); *State v. Stefani*, 142 Idaho 698, 704, 132 P.3d 455, 461 (Ct. App. 2005). In fact, even when circumstantial evidence could be interpreted consistently with a finding of innocence, it will be sufficient to uphold a guilty verdict when it also gives rise to reasonable inferences of guilt. *State v. Slawson*, 124 Idaho 753, 757, 864 P.2d 199, 203 (Ct. App. 1993).

**2.**

For Severson to be found guilty of first-degree murder, the State was required to prove that Severson willfully, deliberately, and with malice aforethought and premeditation, killed Mary by overdosing her, suffocating her, or both. *See* I.C. §§ 18-4001 to -4003. Additionally, the State was required to prove the corpus delicti of the crime. *State v. Cutler*, 94 Idaho 295, 296, 486 P.2d 1008, 1009 (1971). In homicide cases, the corpus delicti consists of two elements:

(1) the death of the individual "named in the charge as . . . being dead;" and (2) the death was caused by a criminal act of the defendant. *Id*. These two elements may be satisfied based solely on circumstantial evidence. *Id*. at 297, 486 P.2d at 1010.

Severson argues that the State failed to meet its burden of proving the corpus delicti of the crime because the evidence it presented only indicated that Mary *possibly* died by suffocating or overdosing. According to Severson, not only did the State fail to prove Mary's cause of death, it failed to show her death was the result of the criminal agency of another.[20] In making his argument, Severson relies on two cases from other jurisdictions, which held that the prosecution did not satisfy its burden of proving the corpus delicti because it failed to prove the victim's cause of death. *See People v. Ehlert*, 811 N.E.2d 620 (Ill. 2004); *Frutiger v. State,* 907 P.2d 158 (Nev. 1995). The cases Severson relies on, however, are distinguishable from the facts of this case. In *Ehlert*, a mother was convicted of murdering her newborn child. *Ehlert*, 811 N.E.2d at 625. On appeal, the Illinois Supreme Court reversed her conviction because the prosecution failed to prove that the baby was born alive or that it died from unnatural causes. *Id*. at 628-30. Similarly, in *Frutiger*, the Nevada Supreme Court overturned the defendant's conviction for murder because, as a result of severe decomposition, pathologists could not conclusively determine the victim's cause of death. *Frutiger*, 907 P.2d at 159, 161-62. Although one pathologist concluded that the victim most likely died from chronic alcoholism, the evidence also showed the victim could have died from natural causes such as heart disease or hypertension. *Id*. at 162.

Unlike the situations in *Ehlert* and *Frutiger*, there was no evidence indicating Mary died from natural causes. The State's medical expert, Dr. Glenn Groben, testified that Mary's death was the result of a drug overdose, suffocation, or a combination of both. The only reason he listed her death as "undetermined" was because the evidence supported both possible causes of death. Regardless of whether Mary's death was caused by suffocation or overdosing, it was not the result of natural causes. Accordingly, the facts of this case are distinguishable from those in *Ehlert* and *Fruitiger*. Because the State was not required to prove the specific cause of Mary's death, the fact that Mary may have died from one of two possible causes did not preclude the jury from finding Severson guilty of murder. *See Cutler*, 94 Idaho at 297, 486 P.2d at 1010; *see*

_____

[20] He points out that the State did not present a murder weapon and that its own experts admitted Mary's death could have been the result of her own accidental ingestion of the pills, sleep apnea, or taking Hydroxycut.

21

*also Sheriff, Washoe County v. Middleton*, 921 P.2d 282, 286 (Nev. 1996) ("The state is required only to show a hypothesis that death occurred by criminal agency; it is not required to show a hypothesis of a specific cause of death.").

Despite Severson's assertions, there was substantial and competent evidence to support the jury's conclusion that he killed his wife by overdosing her, suffocating her, or both. Although Mary's cause of death was ultimately listed as "undetermined," a reasonable jury could have concluded that she was murdered. The autopsy performed by Dr. Groben revealed that Mary had lethal levels of Unisom in her system and toxic levels of Ambien. Dr. Groben only considered overdose a possible cause of death because there was evidence indicating Mary may have been suffocated. Mary's autopsy revealed that there were bruises and abrasions on her face and cuts on the inside of her lip. According to Dr. Groben, the marks were inconsistent with resuscitative efforts, but could have been caused by suffocation.[21] More specifically, he believed that the marks were consistent with those that would result from being suffocated by someone's hand.

There was substantial circumstantial evidence for the jury to conclude beyond a reasonable doubt that Severson was the person who suffocated or overdosed Mary. The fact that the State did not provide direct evidence to that effect does not prohibit this conclusion. *See Cutler*, 94 Idaho at 297, 486 P.2d at 1010. The evidence produced at trial revealed that it was unlikely that Mary's overdose was self-imposed,[22] but there was substantial evidence linking Severson to her murder. The evidence revealed that Severson had a motive to kill his wife, was preparing people for her death, had recently tried to poison her, had tried to conceal the circumstances surrounding her death, and had the opportunity and means to kill her.

The evidence presented at trial revealed that Severson had both financial and personal incentives to kill Mary. Before Mary died, she informed Severson that if he insisted on divorcing her, she would get everything and would request $3,000.00 per month in alimony. Severson then repeatedly told people that he wanted to divorce Mary but could not afford to

---

[21] Severson maintains that marks were caused by the paramedics conducting CPR on Mary, intubating her, and securing an endotracheal tube holder on her face. He points to several facts in the record that could arguably support his assertion. Although Severson's explanations may be plausible, his argument ignores the fact that the State presented evidence indicating the abrasions were inconsistent with resuscitative efforts. Accordingly, it was up to the jury to weigh the conflicting evidence in making its determination of guilt. *Stefani*, 142 Idaho at 704, 132 P.3d at 461.

[22] Mary's treating physician testified that Mary did not have suicidal ideations.

22

because all of the couple's assets were in her name. Additionally, Severson thought he was the beneficiary of Mary's $200,000.00 life insurance policy.[23] Severson began looking into the policy the day Mary died. In a conversation with his son, Severson indicated that he needed to look at the policy because Mary's mother had called and asked about it. However, Mary's mother testified that she did not ask Severson about the policy until the next day and that, when she did ask about it, Severson denied its existence. Finally, Severson's motive to kill Mary was supported by evidence that the Seversons were having marital problems and that Severson was pursuing other women. Severson became engaged to another woman while still married to Mary and then started dating another woman immediately after Mary's death.

There was also evidence indicating that Severson had been planning Mary's death. Shortly after Mary returned to Idaho, Severson began poisoning her and trying to prepare people for her death.[24] More specifically, Severson was poisoning Mary's Hydroxycut with Drano.[25] When Mary first started suffering from stomach problems relating to the contaminated Hydroxycut, Severson began telling people that she was dying, but that Mary's doctor did not want her to find out. He also told people that Mary was suffering from sleep apnea, which causes people to stop breathing in their sleep. However, Mary was never treated for, and never reported suffering from, sleep apnea.[26] Additionally, the emergency room physician who tried to resuscitate Mary testified that the "sleep apnea" symptoms Severson reported Mary allegedly suffered from did not fit any illness she was familiar with. In light of this evidence, the jury could have reasonably concluded that Severson was deliberately planning Mary's death.

---

[23] After Mary died, Severson found out that Mary's mother was the beneficiary.

[24] Severson does not challenge the sufficiency of the evidence supporting his conviction for poisoning Mary.

[25] After beginning their investigation into Mary's death, the police discovered that Mary's Hydroxycut had been tampered with. One of her bottles of Hydroxycut, which appeared to be unopened, had actually been opened and resealed. The shrink-wrap had simply been glued to the bottle in order to appear unopened. When investigators opened the bottle, they discovered the cotton that normally lies on top of the pills had been moved to the side and, in its place, were several discolored pills. Another bottle of Hydroxycut had nearly forty discolored pills. Significantly, no other complaints of contaminated Hydroxycut had been made to the manufacturer or to the Food and Drug Administration. Upon testing the discolored pills, investigators learned that they contained Drano. The Drano found in the pills matched Hydroxycut capsule pieces and residue in a trash can found during the search of Severson's workplace. Additionally, three months after Mary's death, Severson told the woman he was dating that Hydroxycut pills "will kill you and that you could fill the[m] up."

[26] Although there was a note on one medical chart stating "? Sleep Apnea," Mary was not treated for the condition and the doctor who wrote the note testified that he could not remember if Mary reported the condition or if someone else in the room with her did.

23

Finally, the evidence showed that Severson attempted to conceal the circumstances surrounding Mary's death. Severson did not call 911 after he "found" Mary lying on the couch not breathing. Instead, his daughter-in-law made the call after she arrived at Severson's home and realized that he had not called an ambulance. After Mary died, Severson tried to hide the fact that she had been taking sleeping pills. When asked at the hospital what medications Mary had been taking, Severson failed to mention that she was taking Ambien even though he requested and picked up a refill of the medication for her the day before. He also told his daughter-in-law that Mary had not been taking anything to help her sleep. Then, during the search of Severson's home, investigators found a baggie of Unisom pills hidden in the brim of a hat with the word "dad" printed on it.

In sum, although the State's case against Severson was circumstantial, there was substantial and competent evidence to support the jury's conclusion that Severson was guilty of first-degree murder. Severson was the only person besides Mary in the couple's home that night. He had access to Mary's sleeping pills and the means to suffocate her. He "discovered" her lying on the couch not breathing, but did not call 911. He had a motive to kill Mary, had recently tried to poison her, and tried to conceal facts relevant to the cause of her death. While some of the evidence presented may have been susceptible to reasonable inferences of both guilt and innocence, deciding what inferences to draw was up to the jury. *See State v. Ojeda*, 119 Idaho 862, 865, 810 P.2d 1148, 1151 (Ct. App. 1991). For these reasons, the jury could have concluded beyond a reasonable doubt that Severson murdered his wife by suffocating her, overdosing her, or both.

**E.**

Severson argues that the prosecution violated his constitutional right to a fair trial by committing various acts of prosecutorial misconduct. He maintains that the prosecution engaged in misconduct by failing to disclose witnesses and evidence to the defense in a timely manner, ignoring direct orders from the trial court, intentionally asking questions to which the answer was known to be inadmissible, misrepresenting facts, and appealing to the "passions and prejudice of the jurors during closing argument." The State counters that Severson failed to raise some of these objections at trial, that the prosecution did not engage in misconduct, and that Severson was not deprived of his right to a fair trial.

**1.**

The Due Process Clause of the Fourteenth Amendment guarantees that a state may not "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV; *see also* IDAHO CONST. art. I, § 13. The clause has been interpreted to require states to ensure that criminal defendants' trials be fundamentally fair. *Schwartzmiller v. Winters*, 99 Idaho 18, 19, 576 P.2d 1052, 1053 (1978). To be regarded as fundamentally fair, a trial need not be error-free. *Id.*; *see also Bruton v. United States*, 391 U.S. 123, 135 (1968).

As public officers, prosecutors have a duty to ensure that defendants receive fair trials. *State v. Irwin*, 9 Idaho 35, 43-44, 71 P. 608, 610-11 (1903). In carrying out this duty, a prosecutor must "guard against anything that would prejudice the minds of the jurors, and tend to hinder them from considering only the evidence introduced." *Id.* at 44, 71 P. at 611. A prosecutor must also ensure that the jury receives only competent evidence. *State v. Christiansen*, 144 Idaho 463, 469, 163 P.3d 1175, 1181 (2007). Under certain circumstances, a prosecutor's failure to fulfill these duties will result in reversal of the defendant's conviction. *Id.*

On appeal, the standard of review governing claims of prosecutorial misconduct depends on whether the defendant objected to the misconduct at trial. As a general rule, we will not consider arguments made for the first time on appeal. *State v. Sharp*, 101 Idaho 498, 503, 616 P.2d 1034, 1039 (1980). When the alleged error constitutes a fundamental error, however, review on appeal is permissible. *State v. Haggard*, 94 Idaho 249, 251, 486 P.2d 260, 262 (1971). Accordingly, when an objection to prosecutorial misconduct is not raised at trial, the misconduct will serve as a basis for setting aside a conviction only when the "conduct is sufficiently egregious to result in fundamental error." *State v. Porter*, 130 Idaho 772, 785, 948 P.2d 127, 140 (1997). Misconduct will be regarded as fundamental error when it "goes to the foundation or basis of a defendant's rights or . . . to the foundation of the case or take[s] from the defendant a right which was essential to his defense and which no court could or ought to permit him to waive." *State v. Bingham*, 116 Idaho 415, 423, 776 P.2d 424, 432 (1989) (quoting *State v. Garcia*, 128 P.2d 459, 462 (1942)). "However, even when prosecutorial misconduct has resulted in fundamental error, the conviction will not be reversed when that error is harmless." *State v. Field*, 144 Idaho 559, 571, 165 P.3d 273, 285 (2007). Under the harmless error doctrine, a conviction will stand if the Court is convinced beyond a reasonable doubt that the same result

25

would have been reached by the jury had the prosecutorial misconduct not occurred. *State v. LaMere*, 103 Idaho 839, 844, 655 P.2d 46, 51 (1982).

Conversely, when an objection to alleged prosecutorial misconduct is raised at trial, we use a two-part test to determine whether the misconduct requires reversal. *See, e.g., State v. Reynolds*, 120 Idaho 445, 448, 816 P.2d 1002, 1005 (Ct. App. 1991). First, we ask whether the prosecutor's challenged action was improper. *State v. Romero-Garcia*, 139 Idaho 199, 202, 75 P.3d 1209, 1212 (Ct. App. 2003). If it was not, then there was no prosecutorial misconduct. *Id*. If the conduct was improper, we then consider whether the misconduct "prejudiced the defendant's right to a fair trial or whether it was harmless." *Id*. The defendant carries the burden of proving prejudice. *State v. Wright*, 97 Idaho 229, 232, 542 P.2d 63, 66 (1975). When a defendant is unable to demonstrate prejudice, the misconduct will be regarded as harmless error. *State v. Garcia*, 100 Idaho 108, 111, 594 P.2d 146, 149 (1979).

Because different standards govern the alleged acts of prosecutorial misconduct that Severson objected to at trial and those that he did not, his claims will be analyzed accordingly.

**2.**

Severson raises several challenges to the prosecutor's actions for the first time on appeal. Specifically, he challenges the prosecutor's lunch meeting with a witness who had yet to be cross-examined, late disclosure of evidence, "speaking objections," and various comments made during closing arguments.

**a.**

Severson contends that the prosecutor engaged in misconduct by meeting over lunch with a witness during a break from testimony.[27] He maintains that the prosecutor's action was "just another example of an attempt by the prosecution to obtain an advantage over the defense." The State argues that the lunch meeting did not violate Severson's right to a fair trial.

Severson's argument that the prosecutor's lunch with a witness constituted misconduct centers on one of the district court's instructions given on the first day of testimony. Immediately before a short recess, the district court informed the parties that they were not to meet with witnesses during breaks from their testimony. In spite of the district court's

---

[27] During a hearing outside the presence of the jury, defense counsel questioned the witness regarding his lunch with the prosecutor, but did not object to the conduct. Nor did he object to the court's conclusion that the discussion over lunch was not inappropriate. Accordingly, his challenge must be reviewed under the doctrine of fundamental error.

instruction, the prosecutor went to lunch with Dr. Groben after he had taken the witness stand, but before he had been cross-examined by defense counsel. During cross-examination, Dr. Groben admitted to discussing Severson's case with the prosecutor at lunch. The court then held a hearing outside of the presence of the jury to determine the extent of the conversation. Ultimately, the court concluded that the lunchtime conversation was not improper and decided further action was unnecessary.

Severson has failed to show that the prosecutor's lunch with Dr. Groben constituted fundamental error. The prosecutor's actions did not go to the foundation of Severson's case or implicate any of his constitutional rights. Severson merely alleges that "the extent to which the State's willful violation of the district court's . . . order affected the trial proceedings can never be known." Severson's bare assertion does not fulfill his burden of establishing fundamental error. Accordingly, he is not entitled to a reversal of his conviction on this basis.

**b.**

Severson argues that the prosecution's late disclosures of evidence, when considered with its other acts of misconduct, deprived him of his right to a fair trial. Specifically, Severson refers to the State's failure to promptly provide the defense with a complete litigation packet and certain investigation notes.[28] The State argues that we should not consider Severson's argument because he did not "offer any argument or authority on why the late disclosure of . . . evidence rises to the level of prosecutorial misconduct." Alternatively, the State argues that even if we consider Severson's claim, the late disclosures did not rise to the level of prosecutorial misconduct. It maintains that the only time a prosecutor's failure to disclose evidence or witnesses should be treated as misconduct is when the failure is a violation of *Brady v. Maryland*, 373 U.S. 83 (1963).[29] According to the State, other failures to disclose are only discovery violations, the remedy for which is within the trial court's discretion. Additionally, the State argues that, even if the late disclosures constituted misconduct, Severson failed to show he was prejudiced by the untimely disclosures.

The State is incorrect in asserting that Severson did not support his position with argument or authority. In making his argument that the prosecution's late disclosures should be

---

[28] Although the late disclosures were brought to the attention of the trial court, Severson never objected to them. His lawyer merely stated that he "wanted the record to reflect that we are getting large amounts of [late] discovery."

[29] *Brady* requires prosecutors to disclose evidence that is material to the defendant's guilt or punishment. *Brady*, 373 U.S. at 87.

considered in determining whether he was deprived of a fair trial, Severson relies on *Solles v. Israel*, 868 F.2d 242 (7th Cir. 1989). In *Solles*, the Seventh Circuit Court of Appeals acknowledged that late disclosures by the prosecution could constitute misconduct. *Id*. at 248-50. However, the court held that defendants must show the untimely disclosures resulted in prejudice. *Id.* at 250. Only when defense counsel is unable to overcome the adverse affect of the late disclosures will the defendant's conviction be reversed. *Id*.

Although Severson has supported his position with authority, he nonetheless failed to show that the late disclosures constituted fundamental error. The first late disclosure occurred when the State failed to provide documentation regarding the testing and calibration of equipment in a laboratory litigation packet. The second instance occurred when the State belatedly turned over investigation notes prepared by the Food and Drug Administration (FDA). Nothing about the prosecution's late disclosures went to the foundation of Severson's case or otherwise deprived him of his rights. Severson points to only two instances in which the State made untimely disclosures. In neither instance is there evidence indicating that the late disclosure had an adverse impact on the fairness of Severson's trial. Moreover, the record shows that the late disclosures were inadvertent and that the prosecution took prompt actions to provide the information to the defense once the mistakes were brought to its attention. Accordingly, the late disclosures were not fundamental error.[30]

### c.

Severson argues that the prosecution's disregard of the trial court's instruction not to make "speaking objections" was prosecutorial misconduct.[31] He contends that by making "speaking objections" the prosecutor "improperly used [his] position of authority [as] an officer of the court to present improper evidence and argument to the jury that otherwise should not have been considered." The State argues Severson has failed to show that the objections constituted prosecutorial misconduct. It maintains that the district court's instruction was not

---

[30] With regard to the late disclosure of portions of the laboratory packet, the record shows that once the prosecution realized the packet was missing information, it took efforts to obtain the information and provide it to the defense. The prosecution delivered the information in time for Severson to have it examined by his own toxicologist. Similarly, the prosecution provided Severson with the federal investigation notes. At a hearing before the court, Severson's lawyer admitted that he had an opportunity to review the notes and that the late disclosure did not create any problems for the defense.

[31] On the first day of trial, the court informed the lawyers "I don't want speaking objections. I want objections."

clear as to what constituted a "speaking objection" and that throughout the course of the trial the court allowed both parties to make objections similar to those challenged by Severson.

Severson's challenge focuses on three responses the prosecution gave to defense counsel's objections. Only two of those challenges, however, were raised at trial.[32] Those will be dealt with later. Severson's challenge to the speaking objection that was not raised at trial will only be reviewed for fundamental error. That challenge relates to the prosecutor's response to a hearsay objection raised by the defense. Defense counsel objected after the prosecutor asked a police officer where she was told certain pills were found. In response to the objection, the prosecutor argued that the testimony was not hearsay because "I am offering [it] for impeachment evidence . . . not for the truth of the matter stated. . . . I believe the officer either misspoke or has a different recollection of where that item was found. This officer knows that information and I believe has testified about it previously."

The prosecutor's speaking objection was not fundamental error. Severson has failed to indicate how the statement resulted in an unfair trial or deprived him of any other fundamental right. Moreover, in responding to the objection, the prosecutor was not attempting to deliberately violate the court's order. Instead, the prosecutor was merely trying to explain why the statement was not being offered for its truth. Because the prosecutor's statement did not give rise to fundamental error, it does not justify reversing Severson's conviction.

**d.**

Severson challenges several of the prosecutor's statements made during closing argument. Specifically, he argues that the prosecutor improperly commented on his failure to testify, about Mary speaking from her grave, and about Mary's family. He argues that these instances of prosecutorial misconduct, taken individually or together, constituted fundamental error because a curative instruction could not remove the taint of the misconduct in light of the lack of evidence offered by the State. The State argues that Severson has failed to show that any prosecutorial misconduct constituted fundamental error.

Severson's first challenge focuses on the prosecutor's statement that "[t]his is a circumstantial case, because nobody was in that house that night but Mary and Larry. Nobody knows, *that has testified*, what happened between them." He argues that the statement was an

---

[32] With regard to the third speaking objection, Severson objected to the prosecutor's initial question but not the speaking objection itself.

29

impermissible comment on his decision not to testify. The State argues that, when considered in context, the prosecutor's statement was not emphasizing Severson's failure to testify. It maintains the argument was merely a response to Severson's claim that the bruises on Mary's face could have been caused by resuscitative efforts.

The Fifth Amendment prohibits prosecutors from making direct or indirect comments on a defendant's failure to testify in order to infer guilt. *State v. Hodges*, 105 Idaho 588, 591, 671 P.2d 1051, 1054 (1983); *see also Chapman v. California,* 386 U.S. 18, 25-26 (1967); *Griffin v. California,* 380 U.S. 609, 614 (1965). However, the United States Supreme Court has noted that in determining whether a prosecutor's comment violated the Fifth Amendment, "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974). Additionally, such comments must be evaluated "in light of defense conduct and in the context of the entire trial." *Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987) (quoting *United States v. McKoy*, 771 F.2d 1207, 1212 (9th Cir.1985)).

Severson has failed to prove that the prosecutor's statement was an impermissible comment on his silence that constituted fundamental error. Although the statement that "[t]his is a circumstantial case, because nobody was in that house that night but Mary and Larry. Nobody knows, that has testified, what happened between them" could be interpreted as a reference to Severson's failure to testify, it could also be accorded other meanings. For example, the comment could have been a reference to Dr. Groben's inability to conclusively establish Mary's cause of death. Because we will not accord the prosecutor's comment its most damaging meaning, we are unwilling to conclude that the prosecutor was referencing Severson's silence. Nothing in the statement explicitly called for the jury to infer Severson was guilty because of his silence or to convict him on that basis. In all likelihood, given the ambiguous nature of the statement, the prosecutor did not even consider the interpretation Severson would attach to it. Moreover, since the statement was a single, isolated comment made during the course of a seventeen-day trial, there was substantial evidence of Severson's guilt, and the trial court instructed the jury not to draw negative inferences from Severson's failure to testify, the statement did not deprive Severson of due process or render his trial fundamentally unfair.

Severson also challenges the prosecutor's statements regarding Mary speaking from her grave. He relies on *Rockman v. DeRobertis*, 717 F. Supp. 553 (N.D. Ill. 1989), for the proposition that a prosecutor's reference to the victim speaking from the grave is improper. In *Rockman*, the prosecutor stated that the victim was "in his grave crying out for a guilty verdict." *Id*. at 568 (internal alteration marks omitted). On appeal, the court held that the statement did not violate the defendant's right to due process even though it arguably inflamed the emotions of the jurors. *Id*. at 569-70. The court reasoned that the ample evidence supporting the defendant's conviction outweighed what little prejudice the statement created. *Id*. at 570. For this reason, the court concluded that the absence of the error would not have caused the jury to decide the case differently. *Id*.

In this case, the prosecutor's statements that Mary was speaking from her grave were somewhat inflammatory because they were likely designed to appeal to the sympathies and passions of the jury. The comments did not, however, rise to the level of fundamental error. In his closing argument, the prosecutor stated: "Mary still speaks to us today. She is still telling us what happened that night and why she is dead. . . . Mary tells us, she speaks to us from her grave as to who killed her and why she died."[33] These statements were less inflammatory than those in *Rockman*, which actually stated that the victim was calling for a conviction from his grave. Here, the statements were simply referring to Mary's body providing evidence about the circumstances surrounding her death, not to her calling out for Severson's conviction. Because the statements did not result in an unfair trial or deprive Severson of due process, they were not fundamental error.

Next, Severson challenges the prosecutor's references to Mary's family. On rebuttal, the prosecutor argued: "Mary Severson isn't a decedent. Mary Severson was the 35-year-old mother of two boys. Mary Severson was the daughter of Carol Diaz. Mary Severson was the sister of

---

[33] Severson also appears to challenge the prosecutor's statements that "I would love to talk to Mary Severson and find out, on the early-morning hours of February 15th, how she was feeling" and that "[t]here is no innocence in this courtroom except the innocence of Mary Severson. She didn't have to die." Although Severson italicizes the statements in an excerpt of the prosecutor's argument in his brief, he does not argue how they gave rise to fundamental error. He only argues that "the prosecutor's continued references to the victim speaking from the grave and to Ms. Severson's family had absolutely no value except to inflame the passions and sympathies of the jury." However, the italicized statements do not reference Mary speaking from her grave or Mary's family. Because Severson does not support his apparent challenge with argument or authority, we will not address the statements on appeal. *See State v. Zichko,* 129 Idaho 259, 263, 923 P.2d 966, 970 (1996).

Maria Gray. Mary Severson's life had purpose, and it had meaning. Your duty today is to give her death justice." The prosecutor also referred to Mary just having spent her last Christmas with her family.

It is generally recognized that a prosecutor may not comment on the victim's family during closing argument in order to appeal to the sympathies of the jury. *See, e.g., State v. Watlington*, 579 A.2d 490, 493 (Conn. 1990) (holding that a prosecutor's reference to victims and their families during closing arguments was improper); *People v. Harris*, 866 N.E.2d 162, 180 (Ill. 2007) (holding that a prosecutor's statements that the victim was both a father and a husband were improper). Such extraneous statements are considered improper because their only purpose is to encourage the jury to identify with the victim. *Watlington*, 579 A.2d at 493. Whether such comments constitute fundamental error, however, must be considered in the context of the entire trial. *Harris*, 866 N.E.2d at 181.

The prosecutor's references to Mary's family, while arguably improper, did not constitute fundamental error. The statements were not dwelled upon or made in support of an argument that Severson receive a harsher punishment. Instead, the statements merely reiterated evidence that had been produced at trial. Moreover, the trial court instructed the jury on several occasions that the prosecutor's arguments were not to be regarded as evidence. The statements did not impact the fairness of Severson's trial or deprive him of due process and, therefore, were not fundamental error.

In sum, because none of the prosecutor's statements during closing argument rose to the level of fundamental error, they do not justify reversing Severson's conviction.

**3.**

On appeal, Severson renews several challenges to the prosecution's conduct that he raised at trial. These challenges relate to two statements made during closing argument, late disclosure of witnesses, speaking objections, and attempts to introduce "clearly inadmissible" evidence. As discussed above, when a defendant objects to alleged prosecutorial misconduct at trial, this Court need not engage in the fundamental error analysis. *State v. Field*, 144 Idaho 559, 571, 165 P.3d 273, 285 (2007). Instead, we utilize the two-part test for misconduct, which asks whether the conduct was proper and, if not, whether it was harmless error. *Id.*

**a.**

Severson challenges the prosecutor's statements during closing argument that he was having an affair with a "21-year-old tramp" two months before Mary's death and that he was "screwing some 21-year-old."[34] Severson argues that the statements were made solely to evoke feelings of anger towards him and sympathy for Mary. The State argues that, while the prosecutor's choice of words was crude, the statements were not prosecutorial misconduct.

Generally, both parties are given wide latitude in making their arguments to the jury and discussing the evidence and inferences to be made therefrom. *State v. Sharp*, 101 Idaho 498, 504, 616 P.2d 1034, 1040 (1980). It is improper, however, for counsel to use inflammatory words to describe a witness or the defendant during closing arguments. *State v. Phillips*, 144 Idaho 82, 86, 156 P.3d 583, 587 (Ct. App. 2007); *see also State v. Hairston*, 133 Idaho 496, 507, 988 P.2d 1170, 1181 (1999) (concluding that referring to the defendant as a "murdering dog" was improper); *State v. Kuhn*, 139 Idaho 710, 715-16, 85 P.3d 1109, 1114-15 (Ct. App. 2003) (concluding that the prosecutor's statements that the defendant was a liar and a thief constituted misconduct).

Here, the prosecutor's comments that Severson was "screwing" a "21-year-old tramp" were inflammatory and, therefore, improper. The statements did not result in prejudice, however, given the weight of the evidence against Severson and the numerous limiting instructions issued by the judge.[35] Moreover, Severson's affair with Watkins was established at trial and, therefore, the fact that the prosecutor used crude words to describe the affair did not result in prejudice. Accordingly, the statements were not prosecutorial misconduct and do not justify reversing Severson's conviction.

**b.**

Severson argues that the prosecution's late disclosure of witnesses was prosecutorial misconduct. Specifically, Severson refers to the State's late disclosure of fourteen witnesses. In challenging the late disclosures, Severson makes the same arguments he did in his challenge to the late disclosure of evidence. The State argues that the late disclosures did not rise to the level of prosecutorial misconduct.

---

[34] Severson raised this objection to the trial court in his motion for a new trial.
[35] The judge instructed the jury on several occasions that statements made by counsel were not to be regarded as evidence.

During the course of jury selection, the defense discovered that the prosecution had belatedly disclosed fourteen witnesses. Of the fourteen, twelve were foundational witnesses or witnesses that the defense could have discovered on its own. For this reason, the district court concluded that the late disclosure only presented a problem with regard to the other two witnesses. In order to remedy the late disclosure, the district court granted the defense the opportunity to meet with both witnesses and ordered the State to reveal what testimony the witnesses would be called upon to give. The court also gave the defense the opportunity to make additional arguments after meeting with the witnesses, if doing so became necessary.

The prosecution's late disclosure of witnesses was not prosecutorial misconduct. The record shows that the late disclosures were inadvertent and that the prosecution took prompt action to provide the information to the defense once the mistakes were brought to its attention.[36] Moreover, Severson failed to demonstrate that the late disclosures resulted in prejudice. Even if Severson had alleged that the late disclosures resulted in prejudice, the remedial actions taken by the district court would have likely cured any adverse effects. For these reasons, the prosecution's late disclosures did not amount to prosecutorial misconduct.

**c.**

Next, Severson challenges two of the prosecution's "speaking objections." In addition to the previously-discussed speaking objection that Severson did not challenge at trial, there were two alleged speaking objections that Severson did object to below. The first occurred during the State's examination of an agent from the FDA. The defense objected when the prosecutor asked the agent why he did not recommend that the United States Attorney's Office prosecute Severson. In response to the objection, the prosecutor replied, "[i]t would be his investigative jurisdiction if [the Hydroxycut] was not tampered with anywhere but at the end of the consumer line." The court then advised the prosecutor not to testify for the witness while trying to explain why the testimony was admissible. The court also instructed the jury that "statements [made] by counsel are not evidence in this . . . trial. You are to disregard any comments made by the State's counsel as to what he believed the evidence would be." The next instance occurred when the prosecution asked a witness how he responded when he learned from an acquaintance that

---

[36] During a hearing regarding the late disclosure of witnesses, the prosecution explained that some of the "late disclosures" had already been discovered by Severson's former attorneys. Other witnesses were actually on the witness list, had been withdrawn, or were merely foundational. Additionally, once Severson objected to the late disclosures, the State informed him of what testimony the witnesses were expected to give.

34

Severson had said Mary was dying of cancer, but that her doctor did not want her to know. When the defense objected on grounds of relevance, the prosecutor argued that it was relevant "[t]o express his lack of belief in what the defendant had told [the acquaintance]." After the prosecutor responded, the trial court excused the jury and ruled on the objection. The court also told the prosecutor that if he intends to respond to objections by indicating what the witness will testify to, he should ask the court to excuse the jury. Once the jury returned, the court gave it a limiting instruction reminding it that statements made by counsel were not to be regarded as evidence.

The prosecutor's speaking objections were not prosecutorial misconduct. Although a prosecutor engages in misconduct when he or she asks a question, knowing the answer is inadmissible, in such a manner that the jury is able to infer what the answer would have been in light of the question asked, *State v. Christiansen*, 144 Idaho 463, 469, 163 P.3d 1175, 1181 (2007), Severson has not alleged that the prosecutor knew the answers to the above questions were inadmissible. Similarly, he has not indicated what impermissible answers the jury might infer from the questions or statements. While the statement that the FDA would have had jurisdiction if the tampering had not occurred at the end of the consumer line implies the consumer was responsible for the contaminated Hydroxycut, it in no way indicated Severson was responsible for the tampering. Even if it had, there was other evidence linking Severson to the contamination. Additionally, Severson has not articulated how the objections resulted in prejudice or why the curative instructions given to the jury were inadequate to remedy any prejudice the statements may have created. Because the prosecutor's speaking objections did not constitute prosecutorial misconduct, they did not deprive Severson of his right to a fair trial.

**d.**

Severson contends that the prosecutor intentionally asked questions which he knew called for inadmissible testimony. He argues that the improper questioning "could not have any effect but to contaminate the jury's verdict in this case." The State maintains that the prosecutor's questioning was proper and, even if it was not, Severson has failed to establish prejudice.

In support of his argument, Severson points to one of the prosecutor's questions on redirect examination of a witness testifying about the Seversons' life insurance policies. On cross-examination, the witness indicated that he was not aware of any request to increase Mary's coverage and normally would know if such a request had been made. On redirect, the prosecutor

asked the witness "I take it there are some things you probably should be notified of and you are not notified of and do not have personal knowledge of . . . ?" According to Severson, the question was improper because the prosecutor knew Mary's life insurance coverage had not been increased, but nonetheless tried to imply to the jury that it may have been. He argues that this was prosecutorial misconduct because the prosecutor was knowingly attempting to offer false evidence. *See* Idaho R. of Prof. Conduct 3.3(a)(3); *see also United States v. Harris*, 542 F.2d 1283, 1307 (7th Cir. 1976) ("It is improper conduct for the Government to ask a question which implies a factual predicate which the examiner knows he cannot support by evidence or for which he has no reason to believe that there is a foundation of truth.").

The prosecutor's question on redirect examination was not an attempt to offer false evidence. The record indicates that the prosecutor was merely clarifying defense counsel's prior line of questioning and trying to establish the witness's basis of knowledge. Although the question may have implied that the witness might not know if Mary's coverage had been increased, it did not rise to the level of presenting false evidence. Defense counsel opened up the door to the questioning by asking the witness whether he would know if the coverage had been increased. Moreover, any prejudice that may have resulted from the question was cured by the trial court's instructions to the jury that the prosecutor's statement was not evidence and that there was no evidence Severson had requested an increase in Mary's life insurance coverage.

Severson also challenges a question the prosecutor asked a detective about receipts Mary had hidden in the fireplace.[37] The prosecutor asked the detective "Okay. If you could have the opportunity would you ask Mary Severson why she placed them there?" According to Severson, the question was designed to "play on the passions and sympathies of the jury" and "insinuate[] wrong doing on the part of Mr. Severson."

Once again, however, Severson has failed to meet his burden of proof. He simply alleges that the question was "clearly improper," but does not indicate why. Moreover, he has not indicated how the statement resulted in prejudice. Because Severson failed to meet his burden of proving that he was prejudiced by acts of prosecutorial misconduct, his conviction cannot be reversed on this basis.

---

[37] The receipts related to Severson's relationship with Watkins.

36

**F.**

Lastly, Severson argues the "numerous and substantial errors" that occurred during his trial require that his conviction be vacated. He maintains that even if the errors considered individually are harmless, when considered together they deprived him of his right to a fair trial. According to the State, Severson failed to prove that two or more errors occurred during his trial and, therefore, the cumulative error doctrine is inapplicable. Alternatively, even if there were two or more errors, it argues that the judgment of conviction should not be vacated because the errors did not deprive Severson of due process.

"Under the cumulative errors doctrine, an accumulation of irregularities, each of which might be harmless in itself, may in the aggregate reveal the absence of a fair trial in contravention of the defendant's right to due process." *State v. Martinez*, 125 Idaho 445, 453, 872 P.2d 708, 716 (1994). For the cumulative error doctrine to apply there must have been more than one error. *State v. Hawkins*, 131 Idaho 396, 407, 958 P.2d 22, 33 (Ct. App. 1998). Moreover, errors not objected to at trial that are not deemed fundamental may not be considered under the cumulative error analysis. *State v. Higgins*, 122 Idaho 590, 604, 836 P.2d 536, 550 (1992).

Severson was not deprived of his right to a fair trial by an accumulation of errors. Severson was only able to prove that the prosecutor made certain questionable statements during closing argument. Only one of those statements was objected to at trial. Because none of the other statements gave rise to fundamental error, they may not be considered under the cumulative error analysis. Accordingly, Severson has failed to establish the requisite number of errors for the cumulative error doctrine to apply.

**III.**

For the foregoing reasons, Severson's judgment of conviction is affirmed.

Justice BURDICK and Justice Pro Tem TROUT CONCUR.

Justice W. JONES dissenting:

I respectfully dissent as follows:

I disagree with the majority's analysis on whether the numerous and substantial errors committed during trial require reversal pursuant to the cumulative error doctrine; therefore, I

37

respectfully dissent in the conclusion of that section and the result. Further, I dissent from the majority's classification of the prosecutor's misconduct during closing arguments as not constituting fundamental error. I find the prosecutor's conduct relentless and a blatant abuse of power; time and time again the prosecutor continued to engage in a pattern of conduct which waivered on and over the edge of appropriate conduct. Severson's fifth issue on appeal asserted that he was "denied a fair trial due to the serious and unrelenting acts of prosecutorial misconduct." I am limiting my dissent to comments made by the prosecutor during closing arguments and whether the accumulation of any alleged errors warrant reversal pursuant to the cumulative error doctrine. I do not find any one statement, in and of itself, sufficient to warrant reversal. However, I do find a pattern of conduct where the prosecutor continually made arguments for the sole purpose of appealing to the passions and prejudices of the jury.

Severson did not object to any of the statements made during closing arguments; therefore, this Court reviews whether the statements constitute fundamental error. See *State v. Anderson*, 144 Idaho 743, 748, 170 P.3d 886, 891 (2007). "An error is fundamental when it 'so profoundly distorts the trial that it produces manifest injustice and deprives the accused of his fundamental right to due process.'" *Id.* (quoting *State v. Lavy*, 121 Idaho 842, 844, 828 P.2d 871, 873 (1992)). Any alleged misconduct on the part of the prosecutor must be shown to have materially contributed to the jury verdict. *State v. Griffiths*, 101 Idaho 163, 167, 610 P.2d 522, 526 (1980).

"While the due process clauses of the Idaho Constitution, art. 1, s 13, and the fourteenth amendment to the U.S. Constitution do not guarantee errorless trials . . . they do at least ensure that criminal trials shall be fundamentally fair." *Schwartzmiller v. Winters*, 99 Idaho 18, 19, 576 P.2d 1052, 1053 (1978). "It is the duty of a prosecuting attorney to see that the accused has a fair and impartial trial." *State v. Spencer*, 74 Idaho 173, 183, 258 P.2d 1147, 1153 (1953) (finding that the prosecutor's misconduct warranted a new trial). In closing arguments, "[t]he prosecutor should not make arguments calculated to appeal to the prejudices of the jury." ABA Standards for Criminal Justice: *Prosecution and Defense Functions* § 3-5.8 (3d. ed. 1993). The prosecutor is charged with the dual task of ensuring that the government's case is presented "earnestly and vigorously, using every legitimate means to bring about a conviction, but also to see that justice is done and that every criminal defendant is accorded a fair trial." *State v. Reynolds*, 120 Idaho 445, 449, 816 P.2d 1002, 1006 (Ct. App. 1991).

Under the harmless error rule, "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." I.C.R. 52. The purpose of the harmless error doctrine is to prevent setting aside convictions for small errors or defects which were unlikely to affect the result at trial. *Reynolds*, 120 Idaho at 451 n.5, 816 P.2d at 1008 n.5 (quoting *Chapman v. California*, 386 U.S. 18, 22 (1967). "The cumulative error doctrine refers to an accumulation of irregularities, each of which by itself might be harmless, but when aggregated show the absence of a fair trial in contravention of the defendant's right to due process." *State v. Gross*, 146 Idaho 15, ___, 189 P.3d 477, 483 (Ct. App. 2008). Therefore, the comments made by the prosecutor should be addressed by the cumulative effect of the improper statements. *Id.* In order to find cumulative error there must be an accumulation of actual errors. *State v. Hawkins*, 131 Idaho 396, 407, 958 P.2d 22, 33 (1998).

The purpose of "[c]losing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case. . . . [t]o enlighten the jury and to help the jurors remember and interpret the evidence." *State v. Phillips*, 144 Idaho 82, 86, 156 P.3d 583, 587 (Ct. App. 2007) (internal quotations omitted).

Appellant alleges errors by the prosecutor during closing arguments when the prosecutor commented on Severson's right to remain silent and continually appealed to the passions and prejudices of the jury. The violations are so numerous that I am quoting all offensive statements from closing arguments, even those not specifically cited to by appellant in his brief.

> The prosecutor made the following remarks in regard to Severson's right to remain silent:
>
> We are talking about science here; and [the defense attorney's] note -- that he tore down -- said, "[t]heory versus fact." Well, in the real life in this courtroom, the great leveler of society in here, theory and fact do work together.
> It is not a balloon, where one little microscopic pin breaks the whole balloon. This is a circumstantial case, *because nobody was in that house that night but Mary and Larry. Nobody knows, that has testified, what happened between them.*
> . . . .
>
> [Mary's] mouth opened easily. *No one else in this courtroom has testified* in front of you, *that was there*, that they injured Mary Severson's face. The only thing that they can tell you, [from expert testimony], is, these injuries [to her mouth] are consistent with bruising of somebody who could have been smothered.

(Emphasis added). The prosecutor made the following remarks which could have ignited passion and prejudice in the jury by improperly appealing to their emotions:

39

[The trip back to Mountain Home in an attempt to rectify the marriage] didn't go over too well.  On December 18th, [Mary] came back for Christmas to stay, left her mom's house and came back [to Mountain Home], drove back for Christmas, *her last Christmas with her family*.

. . . .

The only thing we have got in this case is what the house can tell us of why Mary died, what the business tells us of why Mary died.  The Hydroxycut will tell us of why Mary died, and what Mary tells us about why and how she died.
Mary does speak to us today 33 months later.  *Mary still speaks to us today.  She is still telling us what happened that night and why she is dead*.

. . . .

During [the time Mary was with her mother in Colorado] the defendant is out gallivanting around with [his girlfriend].  Some people are even saying, 'Oh, I didn't know you had a daughter."  "Well, it's my fiancée."  [Severson] says it's his fiancée.

. . . .

So, Mary gets to come home in October to find that *this 21-year-old tramp* has gone inside her house and painted her guest bathroom.

. . . .

Yeah, [Mary] had some mild depression.  Who wouldn't, after finding out *your husband is screwing some 21-year-old*, having an affair with *some 21-year-old girl*, and you're getting shipped back to Colorado.  Who wouldn't be a little depressed about that, as a young woman?

. . . .

Could [somebody else have tampered with the Hydroxycut bottle]?  I suppose, in the same way that there are little green aliens could be coming to us from Mars or something.  It is possible in one way, shape, or form that that's exactly what somebody did.

. . . .

Mary tells us, *she speaks to us from her grave as to who killed her* and why she died.  All of these circumstances tell us that her body left the indelible evidence that [the defense] cannot get past, and nobody can get past.

. . . .

[The defendant's son] didn't see [the bruises on Mary's face prior to administering CPR].[38]  He wasn't doing that much.  That's force.  That's effort.  That's putting your hand, at least plausibly, in somebody's face and *making sure the breath is out of there.  And making sure you have done the job right, because by God that woman just won't die*.  She's strong; she is the strong one.

. . . .

---

[38] The prosecution asserted an argument at trial that the bruises were caused pre-mortem but did not develop until post-mortem.  The defense asserted the argument that the bruising was caused by recitation efforts.

Please don't hold that fact, that [the other prosecutor misspoke and] may have said [the defendant's girlfriend] was nineteen *instead of the ripe old age of 21*. Or, she still looks like she is about 19.

And I guess all the witnesses say that they saw Larry running around with a girl they thought was his daughter, who was a teenager, who was all of age 18 or 19. That may have been playing in the [other prosecutor's] mind.

. . . .

[The defense attorney] talked a lot about what went on that day, and "[w]e don't' know this, and we don't know that." He is right. I would love to talk to Mary Severson and find out, on the early-morning hours of February 15th, how she was feeling. How did the meal make her feel? How did it feel to go to dinner with her husband, and not be able to order the food you want?[39]

How many sleeping pills did she take? Why did she take them? If she took them, did she know how many she took?

I don't get [to] do that. I don't get to ask those questions. Nobody does. All we know is that according to [the State's expert] -- I think a very credible individual, with nothing to lose in this matter -- gave you a good answer as to how he figured out the total[] [number of pills].

. . . .

We are done: [the defense counsel] and I, and [co-counsel]. Our job here before you is complete. *Innocent until proven guilty, yes. Today ends that preposition.* There is no innocence in this courtroom except the innocence of Mary Severson. She didn't have to die. The only reason she did was the lust and greed of the defendant to get out of a marriage rather than divorce so he could get all the money and then some; *and he could pursue his other women, not this fat woman that he saw in front of him* who refused to give him the divorce.

You have a difficult decision to make. There's people in this courtroom who have been here the entire time that you have heard from. Mary Severson isn't a body. Mary Severson isn't a picture of bruises. Mary Severson isn't a decedent. *Mary Severson was the 35-year-old mother of two boys. Mary Severson was the daughter of Carol Diaz. Mary Severson was the sister of Maria Gray.* Mary Severson's life had a purpose, and it had meaning. Your duty today is to give her death justice. Thank you.

(Emphasis added).

I find the prosecutor's comment on Severson's right to remain silent the most egregious and offensive of all the comments made during closing arguments. The comments served no other purpose then to draw attention to the fact that Severson chose to exercise his constitutional right not to testify at his trial. I can see no other purpose in the statement. The majority sweeps

---

[39] This specific reference relates to testimony from the waitress that Mary had attempted to order cheesy bread or bread sticks and that Larry denied that request.

the statement under the rug by conclusively finding that the statement is "ambiguous" and a "single isolated comment" over the course of a "seventeen-day trial, [where] there was substantial evidence of Severson's guilt." I do not find the prosecutor's statements as innocent as the majority plays them out to be; further, I find a complete lack of other meanings which a jury may attach to the statement "*nobody was in that house that night but Mary and Larry[] nobody knows, that has testified, what happened between them.*" In context it is clear that the prosecutor was referring to the events that occurred between Mr. and Mrs. Severson on the night of Mrs. Severson's death. The prosecutor then clearly states that based on the fact that only two people were present, and one of them is dead, there is only one other person who has knowledge of the details which unfolded that fateful night, and that person did not testify. The meaning is anything but ambiguous and a blatant violation of Severson's constitutional right to remain silent.

> [I]t is not possible to assess the effect that the prosecutor's improper comments had on the deliberating jury. . . . [I]t can and will give rise to whatever inferences the jurors individually or collectively decide to place upon it. Jurors come from all walks of life and many and various are the inferences to which they may be drawn. The obvious one is that men who have nothing to hide speak freely, whilst the guilty say nothing. One might well suppose that for twelve jurors there will be twelve versions of that inference.

*State v. Hodges*, 105 Idaho 588, 599, 671 P.2d 1051, 1062 (1983) (Bistline, J., dissenting).

It is improper for a prosecutor to appeal to the emotions, passion or prejudice of the jury through the use of inflammatory tactics. *Phillips*, 144 Idaho at 87, 156 P.3d at 588. The majority finds that "[t]he prosecutor's references to Mary's family, while arguably improper, did not constitute fundamental error." I disagree. It is improper for a prosecutor to make references to a victim's family during closing arguments. The prosecutor's statements referring to Mary Severson as a mother, a daughter and a sister were used to serve only one purpose, and that is to appeal to the passions of the jury by referencing the victim's family. I find that this behavior rises to the level of fundamental error and is not "merely reiterat[ing] evidence that had been produced at trial." The prosecutor's conduct used Mary's family as a means to convict Severson by appealing to the jury's passions and infringed on Severson's right to a fair trial.

Further, I find that the repeated references to Severson's affair constitute fundamental error. There is a subtle difference in producing evidence of Severson's affair at trial and referring to that affair as Severson "screwing some 21-year-old . . . tramp." I agree with the

majority that these statements are inflammatory and improper. The prosecutor attempted to paint a picture for the jury of Severson running around womanizing while his wife laid dying at home wallowing in self-pity over her recent weight gain. These tactics do not serve any purpose other than to gain a conviction through improper means.

A review of the history of instances of prosecutorial misconduct in this state discloses an interesting pattern. Originally, this Court found little humor in any misconduct committed by the prosecutor's office. See *State v. Irwin*, 9 Idaho 35, 45, 71 P. 608, 611 (1903) (holding that acts of prosecutorial misconduct that prejudice the rights of the defendant warrant reversal). Currently, our appellate system has engaged in a pattern of finding all errors committed as a result of prosecutorial misconduct to constitute harmless error. Over the last ten years this Court has addressed the issue of prosecutorial misconduct in eight separate cases, finding that misconduct occurred in five of those cases, but also finding that none of those cases warranted reversal of the conviction. See *State v. Field*, 144 Idaho 559, 165 P.3d 273 (2007); *State v. Christiansen*, 144 Idaho 463, 163 P.3d 1175 (2007); *State v. Sheahan*, 139 Idaho 267, 77 P.3d 956 (2003); *State v. Page*, 135 Idaho 214, 16 P.3d 890 (2000); *State v. Hairston*, 133 Idaho 496, 988 P.2d 1170 (1999). Further, the court of appeals has found that prosecutorial misconduct existed in ten cases over the last five years. See *State v. Gerardo*, 2009 WL 32488 (Ct. App. 2009); *State v. Coffin*, 146 Idaho 166, 189 P.3d 244 (Ct. App. 2008); *State v. Contreras-Gonzale*s, 146 Idaho 41, 190 P.3d 197 (Ct. App. 2008); *State v. Timmons*, 145 Idaho 279, 178 P.3d 644 (Ct. App. 2007); *State v. Morgan*, 144 Idaho 861, 172 P.3d 1136 (Ct. App. 2007); *State v. Kuhn*, 139 Idaho 710, 85 P.3d 1109 (Ct. App. 2003); *State v. Anderson*, 138 Idaho 359, 63 P.3d 485 (Ct. App. 2003). But, further found that only three of those cases warranted reversal due to acts of misconduct by the prosecutor's office. See *Gross*, 146 Idaho 15, 189 P.3d 477; *State v. Beebe*, 145 Idaho 570, 181 P.3d 496 (Ct. App. 2007); *Phillips*, 144 Idaho 82, 156 P.3d 583. The court of appeals declined to address the issue of whether misconduct existed in two additional cases because the error was harmless in light of the evidence produced at trial. See *State v. Gamble*, 146 Idaho 331, 193 P.3d 878 (Ct. App. 2008); *State v. Romero-Garcia*, 139 Idaho 199, 75 P.3d 1209 (Ct. App. 2003).

Previously, this Court has stated that "[w]here the record shows that the prosecuting attorney has been guilty of misconduct calculated to inflame the minds of jurors and arouse prejudice or passion against the accused by statement in [the prosecutor's] argument of facts not

proved by evidence, the conviction will be set aside and a new trial granted." *Spencer*, 74 Idaho at 183-84, 258 P.2d at 1154. However, the Court quickly limited reversals to instances "[w]here the issue of guilt is debatable or it appears from the record that the jurors could have reasonably entertained doubt as to the defendant's guilt and that misconduct of the prosecuting attorney might well have influenced the result." *Id.* at 184, 258 P.2d at 1154. "The standard for determining whether error of constitutional dimension is 'harmless,' . . . [is whether] the court [is] able to declare a belief that it was harmless beyond a reasonable doubt." *State v. LePage*, 102 Idaho 387, 393, 630 P.2d 674, 680 (1981) (internal quotation omitted).

There is no "authority for the proposition that a fair trial has been had when the verdict is tainted by the jury's exposure to inflammatory rhetoric." *State v. LaMere*, 103 Idaho 839, 869, 655 P.2d 46, 76 (1982) (Bistline, J., dissenting).

> The harmless error doctrine should never be applied to criminal trials that were not fundamentally fair. Where there has not been a fundamentally fair trial, there should be another trial which rises to that standard. It simply will not do for five, seven, or nine appellate judges to uphold convictions derived by trials not fundamentally fair on the predicate that a review of the evidence convinces those judges that the defendant would always be convicted by any reasonable jury on the evidence which was proper. It is, of course, usurpation of the jury function.
> . . .
> Can the day be far ahead when an accused can be denied a trial by jury, convicted by the court, and the conviction affirmed by an appellate court which reasons that its review of the evidence shows it to be is so overwhelming that any reasonable jury would have convicted the accused, for which reason the error in not affording the accused a trial by jury is naught but constitutional harmless error.

*Hodges*, 105 Idaho at 599, 671 P.2d at 1062 (Bistline, J., dissenting).

In the present case, the prosecutor's comments "were not only made by an officer of the court, but they were made in the closing or last speech to the jury, when there was no opportunity for defendant's counsel to criticize or answer them." *Irwin*, 9 Idaho at 42, 71 P. at 610.

The prosecutor's office has been granted leeway by the appellate courts for too long with respect to allegations of misconduct. "It seems that [prosecutors] frequently exert their skill and ingenuity to see how far they can trespass upon the verge of error, and generally in so doing they transgress upon the rights of the accused." *Id.* at 44, 71 P. at 611. As cautioned by the United States Supreme Court over forty years ago, the "harmless-error rules can work very unfair and mischievous results when, for example, highly important and persuasive evidence, or argument,

though legally forbidden, finds its way into a trial in which the question of guilt or innocence is a close one." *Chapman*, 386 U.S. at 22.

Cumulatively, these errors taken as a whole were not harmless. The relentless acts of the prosecutor deprived Severson of his right to a fair trial. The cautionary tales that were developed in the appellate system along with the harmless error doctrine have become our current reality. The more certain a prosecutor is that s/he has conclusive evidence of a defendant's guilt; the freer s/he is to trample upon a defendant's constitutional rights. Further, throughout this process the prosecutor remains secure in the knowledge that an appellate court will affirm, holding that the violations were simply "harmless error." At what point does a reviewing appellate court find that a prosecutor's misconduct that blatantly violates a defendant's constitutional rights constitutes non-harmless error? This Court has determined that the turning point exists when we are certain that any jury would find a defendant guilty beyond a reasonable doubt. How can an appellate court justify which defendants are entitled to a fair trial based entirely on the rationale that any reasonable jury would have convicted the defendant based on the evidence presented? For instance, could a trial court deny a defendant the assistance of counsel and deny him the right to a jury trial and find the defendant guilty of a crime and have an appellate court state that it is convinced beyond a reasonable doubt that the defendant would have been convicted in any event by any jury? Even in light of the absurdity of this example, at which point does the error cross the arbitrary threshold of harmless? Would it be the denial of counsel, the denial of a jury trial, or the combination of the two?

Allowing the harmless error doctrine to dismiss instances of blatant prosecutorial misconduct has effectively substituted our appellate court for the right to trial by jury. It seems that too often this Court has dismissed the claims of prosecutorial misconduct, holding that it is convinced beyond a reasonable doubt the defendant would have been found guilty anyway. Although I believe there was substantial evidence supporting the guilty verdict in this case, I also believe Severson was not afforded a fair trial. Justice is served only when a defendant is either convicted or acquitted following a fundamentally fair trial. Since I do not believe Severson's trial was fundamentally fair, I would reverse the conviction and remand for a new trial.

Justice Pro Tem KIDWELL CONCURS.